UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2- 1- 13
```

------------------------------------------------------------------

COMMUNITY HEALTHCARE ASSOC. OF NEW                  :
YORK, ET AL.,
                                    *Plaintiffs*,    :            10-cv-08258 (ALC)

– against –                                          :            OPINION

NEW YORK STATE DEPARTMENT OF HEALTH,   :
ET AL.,
                                    *Defendants.*    :

------------------------------------------------------------------


ANDREW L. CARTER, JR., UNITED STATES DISTRICT JUDGE:

        Plaintiffs, various health centers in New York State, who receive or are eligible to receive

federal funds to provide medical care to medically underserved areas, sought injunctive and

declaratory relief against the New York State Department of Health, Richard F. Daines, M.D.,

Commissioner of the Department of Health,[1] and State of New York (collectively,

"Defendants"), the state agencies responsible for the administration of the Medicaid program in

New York.  In an opinion dated May 26, 2011, Defendants New York State Department of

Health and State of New York were dismissed as Defendants. *See* Doc. 21, Opinion #100377

(Griesa, J).  The only remaining defendant is the Commissioner.

        The Commissioner moved for summary judgment pursuant to Fed. R. Civ. P. 56 on

August 3, 2012.  Plaintiffs cross-moved for summary judgment on the same day.  For the reasons

---

[1] Although Daines was Commissioner at the time the complaint was filed, soon after Nirav Shah, M.D. was
appointed as the Commissioner and is the proper defendant in this matter.  Throughout this Opinion, for avoidance
of confusion, the Commissioner of the Department of Health will be referred to simply as "Commissioner" or
"Defendant."

discussed herein, Defendant Commissioner's motion is hereby granted in part and denied in part. The Plaintiffs' motion, likewise, is granted in part and denied in part.

## BACKGROUND

1.    Statutory and Regulatory Framework

The present case concerns interpretations of several provisions of the Medicaid Act regarding payments to federally-qualified health centers ("FQHCs") under New York's Medicaid program.  Plaintiffs are health centers in New York State that receive or are eligible to receive federal funds pursuant to Section 330 of the Public Health Service Act, 42 U.S.C. § 254b ("Section 330").  Am. Compl. ¶ 1.  Section 330 health centers serve poor, uninsured and other individuals in medically underserved areas and are FQHCs as defined in the Medicaid statute, 42. U.S.C. § 1396d; Am. Compl. ¶¶ 2, 4-5.

Medicaid is a joint federal-state program that provides medical care to poor and other medically underserved populations.  42 C.F.R § 430.  The federal government reimburses states for a portion of their costs to the extent their program is compliant with strictures of the federal Medicaid statute.  *See* 42 U.S.C. § 1396b. While states are not required to participate in the Medicaid program, those that do must abide by federal rules for reimbursement.  *Himes v. Shalala*, 999 F.2d 684, 689 (2d Cir. 1993) (citing *New York v. Sullivan*, 894 F.2d 20, 21-22 (2d Cir. 1990)).

States electing to participate in Medicaid must submit a plan detailing how the State will expend its funds.  *See* 42 U.S.C. §§ 1396, 1396a (2000). The Center for Medicaid and Medicare Services (CMS) is the federal agency tasked with overseeing the States' administration of the Medicaid Act, including approval of state plans.  42 C.F.R. § 430.15(b).

2

In late 2000, Congress enacted 42 U.S.C. § 1396a(bb), which has governed Medicaid reimbursement for FQHCs since January 1, 2001. The statute revised the methodology for rate-setting for FQHCs such that States are now required to calculate the FQHCs' Medicaid reimbursement rates based primarily on their average costs for furnishing Medicaid services that are "reasonable and related to the cost of furnishing such services" or another methodology mimicking Medicare reimbursement to FQHCs. These rates are inflated annually according to the Medicare Economic Index and adjusted for changes in the scope of services furnished by the individual FQHC. The rates yielded by this methodology are generally referred to as prospective payment system ("PPS") rates.

2.      The Present Action

*PPS Reimbursement Methodology*

Plaintiffs first challenge the methodology of New York's prospective payment system, which uses peer group ceilings as a cap for FQHC reimbursement. In New York, the PPS rate for reimbursement to FQHCs is the lower of allowable costs, as defined by state regulations, or the applicable peer group ceiling. New York's Department of Health ("DOH") first considers each FQHCs patient care costs ("allowable costs") from two base years. DOH then classifies allowable costs as either capital or operating costs and further classifies the operating costs into six categories. The six categories of operating costs are divided by the total number of patient visits to the FQHC, yielding the FQHC's average per-visit costs. The average per-visit costs are compared to ceilings, based on the operating costs of other diagnostic and treatment centers, including non-FQHCs, located in the same region (upstate rural, upstate urban and downstate). The ceiling is 105% of the peer group's average costs, by service category. CMS approved the State's PPS rate methodology in State Plan Amendment ("SPA") 01-03 on April 12, 2002.

3

*Reimbursement for Group Therapy and Offsite Services*

Next, Plaintiffs challenge the level of reimbursement for group therapy and offsite services to FQHCs. CMS approved reimbursement of group therapy and offsite services performed by FQHCs at special rates, lower than the full PPS rates, in SPA #06-11, approved October 30, 2006. Specifically, CMS permitted rates of payment for group psychotherapy and offsite services to be calculated using elements of the CMS-promulgated Resource Based Relative Value Scale. Furthermore, CMS required Medicaid reimbursement for offsite services only if provided to existing patients of the FQHC and where the offsite services were necessitated by health or medical reasons.

*Supplemental Payments*

States are responsible for reimbursing FQHCs who participate in managed care. To the extent that the contract with the managed care organization ("MCO") does not fully compensate the FQHC for their services, states make supplemental payments to the FQHC to cover the difference.[2] From 2001 to 2007, DOH implemented the state plan's FQHC supplemental payment provision that consisted of a provisional (advance payment) wraparound rate and a subsequent reconciliation. In about 2007, DOH changed to a "prospective" methodology meant to determine the annualized costs of the FQHC and which no longer provides for reconciliation.

The prospective methodology is described "NYS Managed Care Supplemental Payment Program Policy Document" ("Supplemental Payment Policy"), *see* Doc. 55-12, 55-14, 55-15, "a

---

[2] Specifically, federal law requires:

In the case of services furnished by a Federally-qualified health center or rural health clinic pursuant to a contract between the center or clinic and a managed care entity . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided under the contract.

42 U.S.C. § 1396a(bb)(5).

4

policy and a method for calculating the state's [FQHC] wraparound payment rate" not described in the State Plan.  (Doc. 60, at 25:7-12).

Since its introduction in 2007, the Supplemental Payment Policy has gone through at least two iterations.  In a previous version, DOH calculated a center's "supplemental payment" rate as "the average difference between what the FQHC is paid by contracted MCOs and [the center's] specific PPS rate for each year." Group counseling and offsite visits were not "eligible for supplemental payments." (Doc. 55-14, at 3).  In the current version,[3] the State treats group counseling and offsite visits as eligible for supplemental payments.  The supplemental payment is the "average difference between what that FQHC is paid by contracted MCOs and its specific blended Medicaid rate for each year." (Doc. 55-12, at 1-2; Doc. 55-15, at 1).  The "blended Medicaid rate" is a weighted average of the center's PPS rate, offsite service rate, and group counseling rate.

*Paid Claim Policy*

According to the Supplemental Payment Policy, a supplemental payment is not required if a claim is validly denied by the MCO. (*See* Doc. 55-12, at 5; Doc. 55-14, at 7; Doc. 55-15, at 6).  This limitation results in what Plaintiffs call a "paid claim" policy.  Since 2007, if an MCO does not make payment for a billable visit, the State concludes that no supplemental payment is required.  While a FQHC may submit claims to MCO and DOH at the same time and receive the supplemental payment, if the center does not receive a payment from the MCO at some point in time, the center has to give back the payment it got from the state. (Plaintiffs' Rule 56.1 Statement of Facts ("SF") ¶¶ 89-90; *see* Doc. 55-11, at 19-22).  The effect is that "the FQHC

---

[3] Because Plaintiffs seek only prospective relief, it is not necessary to determine the exact dates when either iteration of the Supplement Payment Policy went into effect.

must have evidence of a paid claim from the MCO if the contract is billed on a fee-for-service basis." Doc. 55-11, at 20:16-18. Defendant counters that if the MCO denies or refutes a FQHC's claim, the center may bring such disputes before DOH's Bureau of Managed Care Certification and Surveillance.

*Out of Network Reimbursement*

Additionally, according to the Supplemental Payment Policy, supplemental payment is not required if there is no contract between the FQHC and the MCO. (*See* Doc. 55-12, at 5; Doc. 55-14, at 7; Doc. 55-15, at 6). MCOs do not submit invoices to the State for out-of-network FQHCs they do not pay, resulting, Plaintiffs allege, in severe underpayment and direct subsidy of care for Medicaid beneficiaries.

Federal law requires reimbursement for FQHCs for out-of-network services[4], but does not specify which entity is responsible for paying the tab. The State's standard contract with MCOs obligates MCOs to pay when FQHCs provides out-of-network services on an emergency basis and requires MCOs to be "financially responsible" for covered Medically Necessary Services.[5] Model MCO Contract, §10.26.

---

[4] "[N]o payment shall be made under this subchapter to a State with respect to expenditures incurred by it for payment for services provided by [an MCO] which is responsible for the provision (directly or through arrangements with providers of services) . . . unless . . . such contract provides that, in the case of medically necessary services which were provided (I) to an individual enrolled with the entity under the contract and entitled to benefits with respect to such services under the State's plan and (II) other than through the organization because the services were immediately required due to an unforeseen illness, injury, or condition, either the entity or the State provides for reimbursement with respect to those services. 42 U.S.C.A. § 1396b(m)(2)(A)(vii).

[5] As used throughout this section, Medically Necessary Services are the out-of-network services at dispute in this case. The Model Contract defines Medically Necessary Services as "services provided when an Enrollee is temporarily absent from the Contractor's service area, when the services are medically necessary and immediately required: (1) as a result of an unforeseen illness, injury, or condition; and (2) it was not reasonable given the circumstances to obtain the services through a participating provider," thus mirroring the requirements set forth by federal statute. *See Model MCO Contract*, §10.26.

6

*Dental Visits*

New York requires consolidation of dental cleaning and exam into one visit.  The March 2004 Medicaid Update ("2004 Medicaid Update") noted that for the "rare instances" a second visit is required, DOH "would expect annotation in the record to indicate the reason for the second visit."  (Doc. 55-29, at DOH 0000308).  Plaintiffs take issue with the policy of reimbursing dental services, which they allege was revised without process in the 2004 Medicaid Update.  Plaintiffs argue that the rate of payment should be based on the number of threshold visits regardless of the number of services provided and thus the State's policy of requiring consolidation of dental cleaning and exam into one visit is also unlawful.  The Commissioner admits that it issued the 2004 Medicaid Update and did not receive prior approval from CMS to discourage "unbundling" dental cleanings and exams, but contends that it is not a new policy to conduct both services in one visit.

The Commissioner moved for summary judgment to dismiss the complaint on August 3, 2012, including dismissal of a claim that Defendants engaged in an illegal taking or seizure of funds.[6]  Plaintiffs cross-moved for summary judgment on the same day.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no issue of material fact where the facts are irrelevant to the disposition of the matter.  Speculation, conclusory allegations and mere denials are not

---

[6] Plaintiffs included this claim in their original and amended complaints (*see* Compl. ¶¶ 96-100; Am. Compl. ¶¶ 96-100), but have not since reprised or defended this argument in any way.

enough to raise genuine issues of fact. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On cross-motions for summary judgment, the court must consider each motion independently of the other and when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. *Sciascia v. Rochdale Village, Inc.*, 851 F. Supp. 2d 460 (E.D.N.Y. 2012) (citing *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993); *Zaccaro v. Shah*, 746 F. Supp. 2d 508 (S.D.N.Y. 2010).  *See also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir. 1987) ("In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant.")

In matters of statutory interpretation, the first determination is whether Congress addresses how a statute should be interpreted.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Indomenico v. 123 Washington, LLC*, 813 F. Supp. 2d 403, 409 (S.D.N.Y. 2011).

If, however, the Court determines Congress has not directly addressed the precise question at issue or the statutory language is ambiguous, the interpretation of the federal agency responsible for such decisions is entitled to deference. *Mei Juan Zheng v. Holder*, 672 F.3d 178, 184 (2d Cir. 2012) ("An administrative implementation of a particular statutory provision only qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency

generally to make rules carrying the force of law, and that the agency interpretation claiming

deference was promulgated in the exercise of that authority.")

"A court need not find that it would have interpreted the statute in the same manner. . .

Rather, [it] must uphold the agency's interpretation unless it is an impermissible construction of

the statute." *Himes v. Shalala*, 999 F.2d 684, 689 (2d Cir. 1993). "[A] permissible construction

of the statute is one that reflects a plausible construction of the plain language of the statute and

does not otherwise conflict with Congress' expressed intent." *Perry v. Dowling*, 95 F.3d 231,

236 (2d Cir.1996). Additionally, the Court "must exhibit particular deference to the [agency's]

position with respect to legislation as intricate as Medicaid." *Himes*, 999 F.2d at 689; *Cmty.*

*Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002) ("We take care not lightly to

disrupt the informed judgments of those who must labor daily in the minefield of often arcane

policy, especially given the substantive complexities of the Medicaid statute.").

Even so, agency approval is not a rubber stamp for otherwise unsubstantiated or

inconsistent administrative decisions. *Conn. Primary Care Ass'n, Inc. v. Wilson-Coker*,

3:02cv626 (JBA), 2006 WL 2583083 (D. Conn. Sept. 5, 2006) (denying deference to agency

interpretation where federal agency did not rely on agency expertise, but merely adopted an

outdated policy); *NLRB v. Brown*, 380 U.S. 278, 291 (1965) ("Reviewing courts are not obliged

to stand aside and rubber-stamp their affirmance of administrative decisions that they deem

inconsistent with a statutory mandate or that frustrate the congressional policy underlying a

statute"). A federal agency's interpretation will not stand if it is arbitrary and capricious.

*Chevron*, 467 U.S. 837, 843-844; *Batterton v. Francis*, 432 U.S. 416, 425-426 (1977) (citing

Administrative Procedure Act, 5 U.S.C. § 706(2)).

A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes because "*Chevron*'s policy underpinnings emphasize the expertise and familiarity of the federal agency with the subject matter of its mandate and the need for coherent and uniform construction of federal law nationwide. Those considerations are not apt [to a state agency]." *Turner v. Perales,* 869 F.2d 140, 141 (2d Cir. 1989). The pertinent issue is whether the state law and regulations are consistent with federal law. *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495-1496 (9th Cir. 1997). In the absence of *Chevron* deference, we review a state agency's interpretation of a federal statute *de novo* and review all other findings under the arbitrary and capricious standard. *US West Commc'ns, Inc. v. Hix*, 986 F. Supp. 13 (D.D.C. 1997).

While a state agency's interpretation of a federal statute is necessarily not entitled to deference, approval or disapproval of state Medicaid plans constitute federal-agency interpretation if such action reflects exercise of statutorily-conferred authority and is made with the force of law justifying application of *Chevron*. *Connecticut Primary Care Assn, Inc.*, 2006 WL 2583083, at *3. Where "the state has received prior federal-agency approval to implement its plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute, that interpretation warrants deference." *Perry v. Dowling*, 95 F.3d 231, 237 (2d Cir. 1996); *Carroll v. Debuono,* 998 F.Supp. 190, 194 (N.D.N.Y. 1998) ("the proper standard review is the *Chevron* two-prong standard of substantial deference" where the case "challenge[d] a state agency regulation regarding New York's Medicaid program that has been approved by a federal agency").

With this framework in place, we now turn to each of the allegations.

      1.     Law of the Case

Defendant seeks dismissal of Plaintiffs' claim in the Amended Complaint that the Defendants engaged in an illegal taking or seizure of funds. He argues that law of the case should apply to the claim that Defendant engaged in an illegal taking of federal grant money based on a previous ruling dismissing the State of New York and DOH as Defendants wherein the Court noted that "the state has seized no property from plaintiffs." (Doc. 21, May 26, 2011 Op. (Griesa, J.), at 8).

"The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *DiLaura v. Power Authority of State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) (internal quotation marks and citations omitted). While law of the case is not quite as open-ended as the Commissioner suggests, invoked at the mere reassignment of judges, it should be applied to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Devilla v. Schriver*, 245 F.3d 192, 197 (2d Cir. 2001).

Even if a previous ruling is found to be the law of the case, this Court has the discretion to revisit the determination if it was "clearly erroneous and would work a manifest justice." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 819 (1988). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *DiLaura*, 982 F.2d at 76 (internal quotations and citations omitted).

Here, Judge Griesa dismissed the State Defendants because Plaintiffs could not establish either exception to the Eleventh Amendment prohibition on suit against the States. The Court further concluded that this is not a case about illegal seizure of federal funds to allow suit under the theory that individuals may sue states for illegally seized property.

11

These were legal conclusions.  Consequently, it is the law of the case that there was no illegal taking or seizure of funds.  None of the grounds for reconsideration are present here.  This Court will treat the May 26, 2011 Opinion as binding and dismiss the claim that the Commissioner engaged in an unlawful seizure of federal grant funds.[7]

    2.   PPS Rates – Use of Peer Group Ceilings

Plaintiffs allege that the State's imposition of caps, such as the peer group ceilings, on the costs incurred by FQHCs is improper.  The Defendant counters that CMS approved the peer group ceilings on PPS rates in SPA #01-03.

Congress was far from clear on a particular methodology for calculating the PPS rate. Indeed, Congress offers alternatives for determining the PPS reimbursement rate:  it must be equal either to "100 percent of the average of the costs of the center or clinic . . . which are reasonable and related to the cost of furnishing such services" *or* "based on such other tests of reasonableness as the Secretary prescribes in the [Medicare] regulations" for FQHCs, or "in the case of services to which such regulations do not apply, the same methodology" adjusted to account for the scope of services the FQHC provides.  *See* 42 U.S.C. § 1396a(bb)(2); *Cmty. Health Ctr.*, 311 F.3d at 136 ("The phrase "or based on such other tests," signals a plain intention to differentiate between two alternatives.  Any other reading would render § 1396a(bb)(2) largely redundant . . . if "reasonable and related" already held the very same meaning.")

Since the statute is ambiguous, the starting place is not the State's underlying analysis, but whether the federal agency has approved a permissible construction of the Medicaid Act. Here, we can defer to the state agency's interpretation unless CMS's approval of it, in SPA 01-

---

[7] This conclusion is helped along by the fact that Plaintiffs fail to address this argument either in their opposition to Defendant's motion for summary judgment or in their own cross-motions, focusing only on the parameters of the State's reimbursement policy to FQHCs.

03, was arbitrary and capricious. CMS asked specifically about the methodology the State would use for determining peer group ceilings. CMS was also concerned about the possibility that FQHCs would not be fully reimbursed for reasonable costs. CMS said point-blank that the State needed to explain "how this methodology is in compliance with Benefits and Improvement and Protection Act of 2000." (Doc. 55-6). The State responded that CMS had previously approved the use of peer group ceilings to establish peer group ceilings. *Id.* It also provided a state court opinion that an FQHC is not entitled to reimbursement for all of its operating costs, only its reasonable costs, in comparison with facilities offering similar services. *See id.*; *In re Anthony L. Jordan Health Ctr. v. DeBuono*, Index No. 5237-96 (N.Y. Sup. Ct. 1996) (Doc. 55-7).

CMS addressed all of the concerns that Plaintiffs now try to argue merit dismissal of the peer group ceilings—the fear of inadequate compensation, the scope of the peer group—and still approved the SPA. CMS is in a better position to determine the meaning of its own regulations and apparently found this scheme satisfactory to meet the requirements of BIPA. Given that CMS approved the ceilings in another context and another court reached a holding contrary to Plaintiffs' position, the interpretation of the statute to allow peer group ceilings as set forth in SPA 01-03 is, at very least, a plausible one.

Plaintiffs' argument that the PPS rates are arbitrary and capricious, in addition to their inability to shake CMS's express approval of the methodology, falls flat for several reasons. Plaintiffs' reliance on *Motor Vehicle Manufacturers*, 463 U.S. 29, 41 (1983) is inapposite because that case dealt with rescinding protections already in place, while the State's PPS rate was developed specifically for compliance with the new federal requirements. (*See* Doc. 45, Ex. D) ("In keeping with th[e] federal mandate" of Section 702 of the Benefits Improvement and Protection Act (BIPA), New York added "amended Section 2807 of the Public Health Law by

adding a new subdivision 8 which provides for revisions to Medicaid rates...as designated in accordance with 42 U.S.C. § 13696a(aa) [now (bb)].")

The Richardson letter regulating cost containment systems is not jeopardized by the current PPS scheme.  It only requires that "each State must analyze its payment system and any of its cost containment mechanisms as it relates to covering the reasonable cost of providing FQHC and ambulatory services."  SF ¶ 32. There is no indication, besides Plaintiffs' speculation, that the current reimbursement system fails to cover reasonable costs.  In fact, the use of peer groups is a way to ensure that reasonableness of a FQHCs costs.

Congress did intend to ensure adequate reimbursement for FQHCs in particular, but as long as the peer group establishes the reasonable costs by region and service, Plaintiffs have not established why the peer group cannot give an accurate picture of reasonable costs.  For this reason, Plaintiffs' reliance on *West Virginia University Hospitals* is similarly weak.  *W.V. Univ. Hosps., Inc. v. Casey*, 885 F.2d 11, 29 (3d Cir. 1989) (state not precluded from formulating a reimbursement system without empirical evidence about historical costs of operation so long as its reimbursement rates fall within the range of "rates reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities").  Plaintiffs have failed to establish that the PPS methodology is unlawful as a matter of law.  This claim must be dismissed in favor of the Defendant.

3.    PPS Rates for Group Therapy/Offsite Services

Congress's intent about how offsite services and group therapy should be reimbursed is not explicitly set forth in the Medicaid statute.  As before, if this approval was based on agency expertise, we should grant deference to CMS's approval of SPA 06-11.

14

One of CMS's very concerns prior to approval was why full PPS rates should not apply to offsite services. (*See* Doc. 47, Ex. L at DOH 0000237). CMS engaged in extensive questioning, asked specifically about "more specific methodology for off site and group psychotherapy services," *id.*, Ex. M, and requested further explanation of the methodology where the proposed language was "not a clear description to providers how they will be reimbursed," *id.*, Ex. O.

In sum, CMS did not approve SPA 06-11 blindly. CMS considered all of the issues that Plaintiffs now seek to litigate and concluded that the amendment "satisfies all of the statutory requirements" of the Medicaid Act. *Id.*, Ex. Q. The prior approval of CMS yielded a permissible construction that offsite services and group therapy services could be reimbursed at special rates that this court should not disrupt. Furthermore, the approved methodology uses the relative value scale promulgated by CMS to set Medicare payment rates. The requirement for payment to FQHCs allows a reimbursement rate that is "based on such other tests of reasonableness as the Secretary prescribes in regulations under [Medicare]." *See* 42 U.S.C. § 1396a(bb)(2). Defendant cannot then be faulted for using an available methodology for offsite and group therapy, even if that rate is not the one used for other outpatient services. Summary judgment on this point is denied to Plaintiffs and granted to the Commissioner.

4.    Supplemental Payment Procedure and Methodology

a.    Standard of Review

Given that CMS approved SPA 01-03, which at least mentioned the supplemental payment methodology, we should consider whether CMS's approval of the SPA generally is entitled to any deference on the issue of the supplemental payment methodology specifically. If CMS's approval is not entitled to deference or if CMS did not approve the supplemental

15

payment methodology, we review the state's interpretation *de novo* for compliance with federal law.

In reviewing SPA 01-03, CMS submitted questions to DOH seeking clarification of the proposed plan. (Doc. 55-5). Most of the discussion in the letter is about the prospective payment system, but CMS briefly addressed the supplemental payment provision, advising that "the SPA text should indicate that any supplemental payment made is to be equal to the difference between the facility's PPS per visit rate and the amount per visit that is reimbursed by the managed care plan." *Id.* The state incorporated the suggested language with two exceptions: instead of "equal to the difference," the State Plan provides that supplemental payments "will be equal to 100% of the difference" and instead of the "facility's PPS per visit rate", the supplemental payments are calculated using "the facilities [sic] reasonable cost per visit rate."

Without presuming too much, CMS likely concluded that the "reasonable cost per visit rate" was the "PPS per visit rate," which was more thoroughly reviewed in the CMS letter and which had been set forth earlier in the SPA.  Indeed, sister circuits have interpreted it thusly. *Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 12 (1st Cir. 2008) ("Congress has created a detailed scheme for calculating these wraparound payments. . . Paragraphs (2), (3), and (4) of § 1396a(bb) . . . provide the methodology for calculating entitlements in non-managed care systems; in the context of Puerto Rico's managed care system, this number represents the FQHC's gross entitlement from which MCO payments are deducted.").

That CMS requested that the State Plan include the same term of art that had just been used for calculating PPS rates is indicative of a singular meaning, not distinctive methodologies.

16

The state plan and any CMS approval thereof was moored to the idea that the supplemental payments were based on PPS rates.

Perhaps most significant, CMS did not ask any questions about a separate supplemental payment methodology. In contrast to SPA 01-03 and 06-11, which involved weeks of phone conferences and correspondence, there is nowhere near the level of scrutiny over the terms of the supplemental payment methodology. For example, CMS asked specifically about the parameters of "allowable operating cost" and "peer group ceilings" in SPA 01-03. Likewise, before approving the methodology in SPA 06-11 for offsite services and group therapy, CMS required revisions because the proposed language was not "a clear description to providers how they will be reimbursed."

CMS's acceptance of the supplemental payment methodology, at best, is based on the fact that the State Plan largely mimics the text of 42 U.S.C. § 1396a(bb)(5). Any approval of the supplemental payment methodology was not based on the agency's expertise or consideration of the State's interpretation of the supplemental payment methodology as consistent with the Medicaid requirements. *See Conn. Primary Care Ass'n, Inc. v. Wilson-Coker*, 3:02cv626 (JBA), 2006 WL 2583083, at *8 (D. Conn. Sept. 5, 2006); *Rite Aid of Pennsylvania, Inc. v. Houstoun*, 171 F.3d 842, 853 (3d Cir. 1999) (court may find that an agency action is arbitrary and capricious if the agency relied on factors other than those intended by Congress, did not consider an important aspect of the issue confronting the agency, provided an explanation for its decision which runs counter to the evidence before the agency, or is entirely implausible); *Perry*, 95 F.3d at 237. "This is thus one of the rare cases to which the Second Circuit's caution that deference ... even at its highest levels, is not a rubber stamp, applies." *See Conn. Primary Care Ass'n, Inc.*, 2006 WL 2583083, at *8 (internal citations and quotations omitted).

17

CMS did not approve a special methodology for supplemental payments. Even if it did, for the reasons discussed above, such approval should not be accorded deference. Thus, the Court reviews the state's methodology for supplemental payments *de novo*. We must now determine whether the state's interpretation complies with the federal statute.[8]

The current methodology of the supplemental payment is the "average difference between what that FQHC is paid by contracted MCOs and its specific *blended* Medicaid rate for each year," where "blended Medicaid rate" is a weighted average of the center's PPS rate, offsite service rate, and group counseling rate. In passing on the validity of a state Medicaid plan under federal law, the court must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations. *De Luca v. Hammons*, 927 F. Supp. 132, 133 (S.D.N.Y. 1996).

> b.    Procedural Compliance

The alleged procedural problems with the supplemental payment methodology trace back to the basic fact that whether or not CMS has approved the methodology, it has never approved a change in how the methodology would be calculated. Federal law requires prior approval of significant changes to the State Plan, *see* 42 C.F.R. § 430.20, and public notice and comment for changes to the payment methodology, 42 C.F.R. § 447.205 (requiring state agencies to provide "public notice of any significant proposed change in its methods and standards for setting payment rates for services").

---

[8] After finding that CMS's approval is not entitled to deference, the case "move[s] to the second phase to determine what [the state agency] itself did to ensure its Plan's compliance with the [new Medicaid]/BIPA's mandate." *Connecticut Primary Care Assn, Inc. v. Wilson*-Coker, 2006 WL 2583083, *8 (D. Conn. Sept. 5, 2006).

Contrary to Defendant's contention, the fact that CMS did not address it does not mean that the State may change it as its leisure. The requirement that the State Plan comply with federal law is a continuing one. The fact that a State Plan complies with federal law in letter is not sufficient if the State does not comply in practice. 42 C.F.R. § 430.35 ("A question of noncompliance in practice may arise from the State's failure to actually comply with a Federal requirement, regardless of whether the plan itself complies with that requirement."). This continued obfuscation of federal law cannot be condoned on the ground that CMS did not catch the error when it approved the SPA 01-03. Assuming that the State's methodology was ever lawful, the changes in how it would be calculated were never discussed.

Nevertheless, this Court does not reach the issue of whether the supplemental payment methodology is procedurally defective because Plaintiffs are not entitled to relief on this point. New York's alleged violations of federal law for its failure to get public notice or prior approval do not necessarily mean that Plaintiffs have a federal right to relief. *Developmental Services Network v. Douglas*, 666 F.3d 540, 546 (9th Cir. 2011) ("It is pellucid that the mere fact that an action by the State, like obtaining approval of a SPA before implementation, is required does not mean that the Providers have a cause of action under § 1983.").

For a statute to create an enforceable right, Congress must have intended that the provision in question benefit the plaintiff; the plaintiff must demonstrate that the purported right is not so "vague and amorphous" that its enforcement would strain judicial competence; and the statute must unambiguously impose a binding obligation on the States. *Torraco v. Port Auth. of N.Y. and N.J.*, 615 F.3d 129, 136 (2d Cir. 2010) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997)). In particular, the statute should contain "rights-creating language" and be phrased in terms of the persons benefited, not in terms of a general "policy or practice."

19

*Gonzaga Univ. v. Doe,* 536 U.S. 273, 284, 287 (2002).  The statutes and regulations requiring

prior approval and public notice do not indicate Congress's unambiguous intention to benefit

FQHCs specifically.  Thus, there is no basis for relief in a private suit and Plaintiffs' demand for

injunctive relief for procedural defect must be denied.

            c.      Substantive Validity

      Plaintiffs also claim that the methodology is substantively defective because it does not

fully compensate FQHCs for their services.  While injunctive relief cannot be based on the fact

that the State did not get prior approval, it may be based on the fact that Defendants allegedly

infringed on Plaintiffs' right to full payment under section 1983.  *See Pee Dee Health Care, P.A.*

*v. Sanford,* 509 F.3d 204 (4th Cir. 2007) (finding that rural healthcare providers serving

Medicaid recipients had right to sue state officials under § 1983 to enforce rights created under

Medicaid reimbursement program, since statute included language that "state plan shall provide

for payment for services furnished by a rural health clinic" indicated that Congress intended

statute to benefit such providers, was not unduly vague or amorphous, and unambiguously

required states to reimburse such providers in "rights-creating" language).  Whether the

supplemental payment methodology is unlawful as applied goes directly to "payment for services

furnished by a [FQHC]" and thus is enforceable under § 1983 in a private right of action.

      Defendant's moving papers highlight the purported flexibility allotted to States in

fashioning their payment rates, specifically noting that "the statute does not rigidly require that a

FQHC receive the exact same rate of payment for every patient visit, regardless of its nature"

and that States must only pay at rates that cover the reasonable and related costs of the center in

providing such services.

Plaintiffs, to the contrary, contend that there is a simple mathematical equation for determining supplemental payments. The statute is not as dogmatic as Plaintiffs suggest. There are multiple possibilities for calculating the PPS rate for any FQHC. *See* 42 U.S.C. § 1396a(bb)(2); *Cmty. Health Ctr.*, 311 F.3d at 136. This range of options does suggest that States might retain some flexibility in how to adopt their own approaches in rate setting so long as those approaches do not contravene the law as written.

CMS approved the peer group ceilings and special rates for offsite services and group therapy and was satisfied that the reimbursement rates were in line with Congress's mandate for reimbursement to FQHCs. Peer group ceilings assure reasonable costs because the FQHC is judged against peers facing similar financial environments. Similarly, the use of special rates for offsite services and group therapy acknowledges the limitations of these services and provides a basis for not compensating them at the same level as one-on-one, in-center services. These are plausible interpretations for which the Court should not substitute its own judgment.

Furthermore, group therapy and offsite services were previously not compensated at all in supplemental payments. The inclusion of these reimbursements in the methodology even at the special rate, provides more compensation than before to FQHCs. But more important, it strongly suggests that CMS knew that if supplemental payments were made for group therapy and offsite services, these services would be compensated at the rate set in SPA #06-11. This Court cannot overturn a state's interpretation of its own policy where there is no violation of federal law. *Concourse Rehabilitation and Nursing Ctr. v. DeBuono*, 179 F.3d 38, 40 (2d Cir. 1999); *Oberlander v. Perales,* 740 F.2d 116, 119 (2d Cir. 1984). That the supplemental payment methodology is calculated on a weighted scale using two CMS-approved rates of reimbursement is a strong signal of federal approval.

21

To the extent Plaintiffs objected to the supplemental payment methodology for invalid peer group ceilings and special PPS rates, these arguments were discussed—and dismissed— previously. The claim that the supplemental payment methodology, based on the weighted average of the center's PPS rate, offsite service rate, and group counseling rate, is unlawful must likewise be dismissed.

5.      Paid Claim Policy

Plaintiffs challenge the Commissioner's paid claim policy by which Defendant refuses to make supplemental payments on claims for which the MCO does not pay the FQHC.  In doing so, Plaintiffs allege that DOH improperly delegates claim validity to MCOs.

Plaintiffs cite an October 1998 SMDL prohibiting delegation of supplemental payments to MCOs.  *See* Doc. 55-18 ("The language in [§ 4712(b) of BBA] specifically requires States to make these supplemental payments. It is our conclusion that this requirement cannot and should not be delegated to an MCO, and that each State must determine any differences in payment and make up these amounts.")  Defendants cite a Fourth Circuit case holding that requiring MCOs to process and validate claims does not constitute delegation because DOH makes the determination that supplemental payment is necessary and even if DOH does delegate this determination to MCOs, federal law does not require DOH to make the actual determination that a supplemental payment is necessary. *Three Lower Counties Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294 (4th Cir. 2007) ("*Three Lower Counties*").

At first blush, the conclusion of the Fourth Circuit in *Three Lower Counties* is appears to be at odds with the October 1998 SMDL opinion letter.[9]  But the result is the same.  Consistent

---

[9] The 1998 SMDL letter is not entitled to *Chevron* deference.  *Christensen v. Harris County*, 529 U.S. 576, 120 S. Ct. 1655 (2000) (interpretations contained in formats such as opinion letters, not reached after formal adjudication or

with *Three Lower Counties*, section 1396a(bb)(5) and the 1998 SMDL letter only require that *payment* of the balance be paid by the State. It does not require the state to determine if the payment is necessary in the first place. That is, if payment is necessary, the state is responsible for it, but the statute is silent on the entity (be it the State or the MCO or the FQHC) which makes the threshold determination that payment is necessary.

While it is true that there is no assigned referee to determine whether a payment is necessary, the fact that there is no mechanism by which FQHCs are reimbursed for services actually furnished under MCO contract and not paid by the MCO is troublesome and in clear contravention of the plain language of 1396a(bb)(5). There may be no assigned referee, but the FQHC is the clear beneficiary of the statute and the State has a clear responsibility to make a supplemental payment "in the case of services furnished by a FQHC." This supplemental payment must be equal to the amount by which the PPS rate exceeds the payments provided under the contract. Notably, the phrase "payments provided under the contract" permits deduction only of amounts *actually* paid by the MCO to the FQHC. *See Concilio de Salud Integral de Loiza v. Perez-Perdomo*, 551 F.3d 10, 14 (1st Cir. 2008). Whether or not the MCO makes a payment, the State is responsible for the supplemental payment (which may in fact be the entire PPS rate, if the MCO fails to make a payment).

There is no basis for the State's conclusion that the FQHC must accept the loss because the MCO denied payment for an otherwise legitimate visit. Determining the amount the MCO will pay is certainly necessary for the calculation of supplemental payments, but the MCO's

---

notice-and-comment, are not entitled to Chevron deference, only respect and only to the extent they have the power to persuade).

determination of validity cannot be the end of the inquiry.  There are many reasons why a MCO might not pay an otherwise valid claim.

To prevent fraudulent claims as the State certainly has in interest in doing, these payments might properly be reserved for a more robust audit or administrative process.  The current audit process by DOH's Bureau of Managed Care Certification and Surveillance is only available "on the grounds that the health care service is not medically necessary or is experimental or investigational." N.Y. COMP. CODES R. & REGS. tit. 10, § 98-2.1 (2013).  To the extent that there may be other reasons a valid claim would be denied by the MCO, Plaintiffs must be able to challenge these adverse payment determinations as well.  The paid claim policy must be enjoined until modified in the manner set forth in this Opinion.

### 6.   Out-of-Network Reimbursement

Plaintiffs also allege that the State will not reimburse FQHCs that are out-of-network providers to Medicaid beneficiaries enrolled in a managed care program.  Supplemental payments are required when an FQHC provides services as a result of its contract with the MCO.  *See* 42 U.S.C. § 1396a(bb)(5).  But in the absence of a contract with an MCO, the State instead is wholly responsible for the reasonable costs of the FQHC at the prevailing PPS rate.  *See* 42 U.S.C. § 1396a(bb)(2).

The plain language of Section 1396a(bb)(5) requiring supplemental payments supports such an understanding.  Supplemental payments are required "[i]n the case of services furnished by a [FQHC] pursuant to a contract between the center or clinic and a managed care entity."  The operative phrase is "pursuant to."  Merriam-Webster defines "pursuant to" as "in carrying out, in conformity with; according to."  An out-of-network provider could never provide services *pursuant to* a contract; that is precisely why the provider is out-of-network.

24

For purposes of subsection 5, the fact that the Medicaid beneficiary or State have a contract with the MCO is entirely irrelevant. Either the FQHC has a contract with the MCO or it does not, and that determination sets the state's payment responsibility to FQHCs.[10] Thus, if the services are provided pursuant to a contract with the MCO, subsection 5 applies and the State is responsible for reimbursement for what the MCO does not pay (i.e., a supplemental payment). If, on the other hand, the services are not provided pursuant to a contract with the MCO, subsections 2 through 4 apply and the State is responsible for the reasonable charges the FQHC incurs (i.e., the PPS rate).

Section 1396b(m)(2) requires certain provisions be included in a contract between a State and the MCO. Notably, the State-MCO contract must address the possibility of out-of-network services, *see* 42 U.S.C. § 1396b(m)(2)(A)(vii) ("services which were provided . . . other than through the organization because the services were immediately required"), and must provide who (of the State or the MCO) will reimburse providers for such services. Medicaid expects either the state or MCO to reimburse the costs of the provider's services for Medically Necessary Services. In New York, the parties have contracted this responsibility to the MCO. *See* Model MCO Contract, §10.26.

There is a conflict (or at least a substantial loophole) in the understanding of the Medicaid framework and the State-MCO contract. On the one hand, the State is responsible for the difference between the amount of the MCO payment and the per visit rate. 42 U.S.C. § 1396a(bb)(5). On the other hand, the state may delegate responsibility for coverage of medically

---

[10] The Plaintiffs' reliance on 1396u-2 (provision for Indian Medicaid enrollees visiting Indian FQHCs) is misplaced. The statute only establishes that both 1396u-2 and 1396a(bb)(5) apply to Indian FQHCs. The existence of 1396u-2(h)(2)(C)(i)(II) says nothing about how managed care entities must treat non-Indian FQHCs.

necessary services to the MCO. *See* 42 U.S.C. § 1396b(m)(2)(A)(vii) (requiring that "either the entity or the State provides for reimbursement with respect to those services"). New York has chosen to delegate payment responsibility to the MCO in which the Medicaid beneficiary receiving out-of-network care is enrolled.

But the burden of this loophole should never fall on FQHCs, which are covered by the federal statute for their services. *Three Lower Counties*, 498 F.3d at 304 ("In light of unmistakably clear statutory requirements," State's position that FQHC must absorb costs of out-of-network services was "unjustifiable"); *Three Lower Counties Cmty Health Servs., Inc. v. Md. Dep't of Health and Mental Hygiene*, WMN-10-2488, 2011 WL 31444, *3 (D. Md. Jan. 5, 2011) ("[A]lthough the statute does not specify whether the State or the MCOs must bear such costs. . . out-of-network FQHCs are entitled to compensation for all qualifying emergency services they provide.").

For one, contrary to Defendants' contention, FQHCs have a very limited basis to seek compensation from a MCO with which it does not have a contract. As stated above, the current claims review process proceeded by DOH does not allow satisfactory resolution for out-of-network FQHCs. And it cannot seek to enforce the State's contract with the MCO, requiring MCOs to reimburse providers for Medically Necessary Services. This burden must be borne by the State, which can bring suit against a non-compliant MCO for breach of contract, unjust enrichment and any other claims as it may see fit. Furthermore, "payment by an MCO is often unrelated to whether an encounter meets the statutory criteria for Medicaid eligibility." *N.J. Primary Care Ass'n v. N.J. Dep't of Human Servs.*, 12-413 (JAP), 2012 WL 2594353, *6 (D.N.J. July 5, 2012). For instance, MCOs do not ordinarily pay for out-of-network services. Thus, it might be their default policy to dismiss these claims out of hand, regardless of their contract with

26

the State providing otherwise or a Medicaid patient's statutory coverage. The State's failure to pay for out-of-network services not paid by the MCO must be enjoined.

       7.     Reimbursement for Discrete Dental Services

     The 2004 Medicaid Update informs FQHCs that for non-emergency initial visits, a dental cleaning, x-rays (if required) and exam are typically supposed to be completed in one visit. (Doc. 55-29). However, in rare instances if the services must be administered in two visits, an appropriate notation would be expected. *Id.*

     Contrary to Plaintiff's argument, the fact that two services are provided by distinct licensed professionals does not necessarily mean that Congress intended two visits. For instance, during a physical at the doctor's office, the preliminary diagnostics are taken by a nurse or even an intern or medical assistant, whereas the actual exam is performed by a doctor or nurse practitioner. The idea that those two services must necessarily be provided separately does not comport with standard medical procedure. States do have an interest in providing care in a cost-effective way and preventing abuse of the system. The statement reminds Medicaid practitioners of those interests.

     Furthermore, this statement in no way represents a new policy as Plaintiffs would suggest, but rather the optimal standard of care. This we can discern from reading the surrounding reminders about dental practice. For instance, the 2004 Medicaid Update counsels that "[d]ental x-rays should be clear and allow for diagnostic assessment" and "patient medical histories should be updated periodically (annually at a minimum) and maintained as part of the patient's dental records" so as "to avoid unnecessary repetition of services." *Id.* These are not new policies, but reminders of longstanding guidelines for effective case management and accurate diagnosis and treatment.

Lastly, the consolidation does not, on its face, disallow two payments, if there are meritorious reasons for two visits. The State only expects a notation to indicate the reason for the second visit, which is not outside the bounds of feasibility even for a busy dental practice. FQHCs are not entitled to actual costs, but only costs that are reasonable. *See* 42 U.S.C. § 1396(a)(bb); *N.Y. State Health Facilities Ass'n v. Axelrod*, 154 A.D.2d 10, 13 (N.Y. App. Div. 1990). This Medicaid 2004 Update is consistent with the philosophy of reimbursing reasonable costs only. The Plaintiffs' motion is denied on this point, and Defendant's motion is granted.

8. Availability of Injunctive Relief

Having determined that Plaintiffs are entitled to summary judgment for the current paid claim policy and out-of-network policy, the Court must determine the appropriate remedy. In particular, Plaintiffs seek injunctive relief to prohibit the Commissioner from further non-compliance with federal FQHC payment requirements.

Once plaintiffs have demonstrated success on the merits, permanent injunctive relief is available if there is no adequate remedy at law and the balance of equities favors the moving party. *N.Y. State Nat'l Org. for Women v. Terry*, 704 F. Supp. 1247, 1262-1263 (S.D.N.Y. 1989) (citations and internal quotation marks omitted). Although a serious threat of irreparable injury usually must be shown on an application for a preliminary injunction, it is not an independent requirement for obtaining a permanent injunction as it is only one basis for showing the lack of an adequate legal remedy. *Id.* n. 20; CHARLES ALAN WRIGHT ET AL., 11A FEDERAL PRACTICE & PROCEDURE § 2944 (2d ed. 2012) (noting that plaintiff could also establish inadequate legal remedy if a monetary award would be speculative, multiple actions would otherwise be necessary or damages are not adequate compensation).

28

Here, there is no adequate remedy at law because there is a serious likelihood that without injunctive relief Plaintiffs are at risk of not being adequately reimbursed for their services in the future, and will have to bring additional lawsuits to defend their right to reimbursement.

The balance of the equities also favors Plaintiffs who do not receive reimbursement as contemplated by Congress if the MCO refuses to make payment. The State, on the other hand, will not be unduly disadvantaged by having to comply with federal law. The proposed expansion of the audit system to rectify unpaid claims will balance Plaintiffs' right to reimbursement for meritorious claims with Defendant's interest in fraud prevention.

The interpretation that FQHCs must be reimbursed for Medically Necessary Services corresponds with a holistic view of section 1396a(bb) that is hardly inequitable. Furthermore, as discussed above, the State is better situated to seek indemnification from the MCO according to the terms of their contract. Because there is no adequate remedy at law and the balance of equities favors the Plaintiffs, injunctive relief is permissible as to the paid claim policy and the out-of-network policy.

## CONCLUSION

The Commissioner's motion for summary judgment dismissing the Complaint is granted in part and denied in part, consistent with this Opinion. Likewise, Plaintiffs' cross-motion is granted in part and denied in part. The paid claim policy and out-of-network policy are enjoined until modified in a manner consistent with this Opinion.

SO ORDERED.

Dated:        February 1, 2013
               New York, New York

United States District Judge

30