

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

KENT T. STAUFFER
EXECUTIVE DEPUTY ATTORNEY GENERAL
DIVISION OF STATE COUNSEL

LISA DELL
ASSISTANT ATTORNEY GENERAL IN CHARGE
LITIGATION BUREAU

May 24, 2013

By E-mail
Hon. Judge Andrew L. Carter, Jr.
United States District Court
Southern District of New York
40 Foley Square, Room 435
New York, NY 10007

(212) 416-8590

Re: <u>Community Health Care Association of New York, et al. v. New York State Department of Health, et al.</u>; 10 Civ. 8258 (ALC)(AJP)

Dear Judge Carter:

This office represents defendant Nirav R. Shah, M.D., M.P.H., Commissioner of the New York State Department of Health ("State defendant" or "State"). This letter replies to the objections to the State's plan of action that are contained in the letter of Matthew Freedus, Esq., dated May 15, 2013 ("Freedus Ltr.").

1.  **The Court's Opinion and Order**

In its February 1, 2013 Opinion and Order, the Court ruled that pursuant to 42 U.S.C. § 1396a(bb)(5), the State must make supplemental payments to Federally Qualified Health Centers ("FQHC"s) covering all legitimate reimbursement claims which are denied by managed care organizations ("MCO"s) (Opinion at 23-24). The Court suggested that unpaid MCO claims may be rectified through "a more robust audit or administrative process" (Opinion at 24), and it required a plan of action to afford "full reimbursement to FQHCs for services provided, subject to verification" by the State defendant (Order at 1). The State defendant's proposed plan meets these directives by offering several administrative avenues by which FQHCs can dispute MCO denials of their reimbursement claims.

Page 2

## 2. The State's Plan of Action Complies with the Court's Ruling

The State's plan of action provides that disputed MCO claim denials can be resolved by FQHCs though the following processes: (1) filing formal complaints with the Department of Health Bureau of Managed Care Certification and Surveillance, which addresses a variety of provider/managed care issues; (2) utilizing internal grievance procedures that MCOs are required to offer providers; and (3) filing "external appeals" with the Department of Financial Services, which employs independent reviewers to resolve whether the requested services were medically necessary (Letter from Nina M. Daratsos, dated April 2013 ["Daratsos Ltr."]). The State's plan proposes that FQHCs be required to utilize these processes to contest MCO claim denials either as a prerequisite for <u>or in conjunction</u> with the submission of requests for State supplemental payments (<u>see</u> Letter from Robert A. Veino, dated April 23, 2013 ["Veino Ltr."] at 2; Daratsos Ltr. at 1-2). Thus, the State defendant does not, as plaintiffs contend, "disavow[ ] the State's payment obligation" when an MCO denies a claim (Freedus Ltr. at 2). Rather, the plan provides a reasonable corrective mechanism to identify and ensure reimbursement of claims that have been invalidly denied by an MCO. This approach merely requires FQHCs to pursue resolution of their disputes with MCOs through available means that afford the State defendant a fair opportunity to ensure verification of such claims.

Plaintiffs object to using these administrative complaint processes to resolve their payment disputes with MCOs on the grounds that it is "unnecessary" or "burdensome" (Freedus Ltr. at 3-4). That objection is baseless, as the undisputed evidence on the parties' summary judgment motions showed that other providers successfully utilize the State's complaint procedures for resolving claim denials by MCOs, whereas plaintiffs have failed to utilize those same procedures (<u>see</u> D.I. # 49, Daratsos Aff., at ¶ 6). Notably, plaintiffs could only present evidence that <u>two</u> out of <u>dozens</u> of plaintiff FQHCs suffered improper claim denials by MCOs, and on only limited issues (D.I. # 61, Daratsos Opp. Aff., at ¶¶ 2-4). In such context, requiring FQHCs to present payment disputes for resolution administratively in conjunction with obtaining supplemental payments from the State would not appear to present major burdens for them. It also would be fully consistent with their duty under federal law to "make and . . . continue to make every reasonable effort to collect reimbursement for [their] costs in providing health services to persons who are entitled [to Medicaid]." 42 U.S.C. § 254b(k)(3)(F).

Plaintiffs' claim that the State defendant's plan violates its duty to be "the final decision-maker on whether an FQHC is entitled to payment under federal law" (Freedus Ltr. at 2) overlooks what has been presented. The plan of action clearly states that "[p]roviders may file a formal complaint with the Department when they believe an MMCO has acted inconsistently with prevailing statute and regulation, such as improperly adjudicating claims . . . [and] failing to reimburse for the

provision of Medicaid covered services included in the MMCO benefit package . . ." (Daratsos Ltr. at 1). Thus, the State addresses regulatory matters within its jurisdiction, specifically whether payment denials are consistent with federal and state law. However, the State defendant believes that technical contract disputes between FQHCs and MCOs can be more efficiently resolved first through the MCO's internal grievance procedures (Daratsos Ltr. at 1-2).[1] It should also not be forgotten that we are dealing with situations in which FQHCs and MMCOs have voluntarily entered into contracts with each other which necessarily impose burdens and obligations on both sides. Indeed, the Court recognized that the parties to a contract are in the best position to enforce its terms by suit (Opinion at 26).[2]

Plaintiffs' assertion that the State defendant itself must resolve all payment disputes between FQHCs and MCOs and that the FQHCs' only role is to inform it of denied claims (Freedus Ltr. at 3-4), would impose an unreasonable and massive burden on the State defendant to use its audit process to duplicate the validation functions performed by MCOs. This is plainly inconsistent with federal law. The federal statute requires supplemental payments only "in the case of services furnished by a[n] [FQHC] *pursuant to a contract* between the center or clinic and a managed care entity." 42 U.S.C. § 1396a(bb)(5)(A) (emphasis added). Logically, the initial determination whether a FQHC's claim is valid should be made by the party paying it under that contract - - the MCO. Plaintiffs' view that the State must replicate the MCO's function (Freedus Ltr. n. 3) is clearly at odds with the statute and the Court's ruling that federal law "does not require the state to determine if the payment is necessary in the first place" (Opinion at 23); see also Three Lower Counties Cmty Health Servs., Inc. v. Maryland, 498 F.3d 294, 305 (4th Cir. 2007). It also defies a basic purpose of managed care to delegate individual claims management to MCOs (which the State pays to perform such services).[3]

---

[1] Under federal Medicaid law, "[e]ach medicaid managed care organization shall establish an internal grievance procedure under which an enrollee who is eligible for medical assistance under the State plan under this subchapter, *or a provider on behalf of such an enrollee*, may challenge the denial of coverage of or payment for such assistance." 42 U.S.C. § 1396u-2(b)(4) (emphasis supplied). The State's plan incorporates this requirement, while plaintiffs' objections would render it nugatory.

[2] With respect to "out-of-network" services, the Court found that the State is in a better position than FQHCs to enforce the terms of its contract with the MCO (Opinion at 26). By the same logic, an FQHC is best suited to enforce a contract between itself and an MCO.

[3] Similarly, plaintiffs cannot plausibly assert that 42 U.S.C. § 1396a(a)(25) bars the State from relying on MCOs to process claims when that would undermine the whole function of Medicaid managed care. Nor could plaintiffs assert a private right of action under that section in any event. In re: Oxycontin Antitrust Litig., 821 F. Supp. 2d 591, 600 (S.D.N.Y. 2011); Mejia v. City of New York, No. 01 Civ. 3381, 2004 U.S. Dist. LEXIS 25058, at **32-35 (S.D.N.Y. 2004).

Page 4

Plaintiffs' attempt to invoke 18 U.S.C. § 208 (Freedus Ltr. at n. 3) is likewise unavailing, as that section is a conflict of interest provision barring federal employees from determining matters in which they have a financial stake. It would be little short of absurd to read that section as precluding Medicaid MCOs from determining their rights and obligations under contracts (expressly contemplated by federal law) to which they are parties. Further, insofar as plaintiffs complain that the State defendant impermissibly delegates to MCOs the responsibility to make supplemental payments, that claim is clearly erroneous as the State indisputably calculates the supplemental payment rates and makes such payments.

At bottom, plaintiffs' opposition to the State's plan rests on an untenable premise that all MCO claim denials are presumably invalid and it is the State defendant's unilateral burden to prove otherwise through audits. However, nothing in the record suggested wholesale errors in MCO claim determinations warranting that presumption. The State submits that a more practical solution is for FQHCs to pursue billing disputes with MCOs through the various methods in its plan.

### 3. The State Defendant Correctly Implemented Special Rate Codes

Plaintiffs also object to the State defendant's implementation of special rate codes for centers to bill Medicaid at their full PPS rate for claims denied by MCOs, and its requirement that the centers return any supplemental payments that they have already received for the same services. However, it is difficult to fathom plaintiffs' objection to setting their supplemental rate for unpaid claims at their PPS rate, as there is no dispute that "[w]hen an MCO fails to make its required payment for a service, the State's payment obligation is the center's 'entire PPS rate' for the particular service" (Freedus Ltr. at 1) (see Opinion at 23). Plaintiffs fail to explain how they could be harmed if the State sets their special rates at their full PPS rate instead of "the difference between the center's wraparound rate and PPS rate" (Freedus Ltr. at 4), which could only be a lesser amount.

Plaintiffs additionally claim that the requirement that they return previously received supplemental payments before obtaining the full PPS payment constitutes an "unnecessary and burdensome process" (Freedus Ltr. at 4). However, as explained by the State defendant, adjusting rates to comply with the Court's February 1, 2013 ruling was a difficult, time-consuming process which it performed as expeditiously as possible (see Veino Ltr. at 2-3). Any burden on plaintiffs' cash flow to return excess payments will be temporary, as once a final plan of action is approved the centers need only submit one supplemental claim per visit (subject to the verification procedures as detailed in the plan).

### 4. No Objection to 30-Day Extension to File Claims

The State defendant has no objection to plaintiffs' request that they be given an extension of time until 30 days after the Court approves a plan of action to submit supplemental claims affected by the Court's February 1, 2013 Opinion and Order (Freedus Ltr. at 5), provided all claims must be finally submitted and payable within two years of the service date.

### 5. Expansion of Relief to Non-parties is Unwarranted

Plaintiffs' contention that the State defendant's plan of action must be applied to "all New York FQHCs" and/or "non-plaintiff health center members of CHCANYS," based on associational standing (Freedus Ltr. at 5) should be rejected by the Court for a variety of reasons.

The plaintiffs' Complaint did not seek class-wide relief, nor was injunctive relief requested for any entities except for the plaintiff centers (see D.I. # 12, First Amended Complaint for Declaratory and Injunctive Relief at p. 42, Prayer for Relief: "[D]irecting defendants . . . to submit a plan of action to the Court to implement a payment system . . . toward Plaintiff centers that is compliant with federal law"). Further, while the Complaint named "Does 1-20" as defendants, it did not indicate any unnamed plaintiffs and CHCANYS admittedly was only authorized to sue on behalf of certain FQHC members (Complaint, at ¶ 11). Plaintiffs also never moved to add new parties (see D.I. # 25, Scheduling Order, dated 2/10/12, requiring any motion to add parties to be made by 3/19/2012).

Inasmuch as certain centers clearly decided not to join as plaintiffs in this case, fairness should not allow them to benefit from the relief awarded at this late stage. Awarding injunctive relief for un-named parties after the merits of the case have been decided would be especially prejudicial to the State defendant because it had no reason to seek discovery concerning those centers, as no such relief was sought for them. Indeed, the identities of those centers have never been disclosed, and plaintiffs do not even clarify whether they now seek relief for "all New York FQHCs," or merely "non-party members of CHCANYS."

### 6. Recalculation of Supplemental Rates

As a final matter, plaintiffs' request that the State's plan of action recalculate FQHCs' supplemental rates to include claims unpaid by MCOs (Freedus Ltr. at 6) is also unwarranted. The Court has examined at considerable length the State defendant's methodology for establishing the centers' supplemental rates and determined that it complies with federal law (Opinion at 15-22). As plaintiffs note, they already intend to challenge the State's entire methodology on appeal. Moreover, plaintiffs' suggestion that their supplemental rates must be recalculated

Page 6

to include visits for which the MCOs deny reimbursement labors under the same false premise as their other objections - - that all such denials must be incorrect. The State plan offers a far more practical approach because it separately reimburses denied claims at the full PPS rate, thereby avoiding the need for retrospective adjustments to the FQHCs' supplemental rates after the validity of the denied claims can be verified through the methods set forth in its plan of action.

    Thank you for your Honor's consideration of this matter.

                                      Respectfully submitted,

                                      James M. Hershler
                                      Assistant Attorney General

cc:  Hon. Magistrate Judge Andrew J. Peck
      Matthew S. Freedus, Esq.