USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 7, 2014

13-771-cv; 13-991-cv; 13-3332-cv; 13-3454-cv
Community Health Care Association of New York v. Shah

1    UNITED STATES COURT OF APPEALS
2    FOR THE SECOND CIRCUIT
3    _____
4                                              1:10-cv-08258-ALC
5    August Term, 2013
6
7    (Argued: June 3, 2014                    Decided: October 7, 2014)
8
9    Docket Nos. 13-771-cv; 13-991-cv; 13-3332-cv; 13-3454-cv
10
11    _____
12
13    COMMUNITY HEALTH CARE ASSOCIATION OF NEW YORK, ANTHONY L.
14    JORDAN HEALTH CENTER, BEDFORD STUYVESANT FAMILY HEALTH
15    CENTER, INC., BROOKLYN PLAZA MEDICAL CENTER, INC.,
16    BROWNSVILLE MULTI-SERVICE FAMILY HEALTH CENTER, CHARLES B.
17    WANG COMMUNITY HEALTH CENTER, INC., COMMUNITY HEALTH
18    CENTER OF BUFFALO, INC., COMMUNITY HEALTH CENTER OF
19    RICHMOND, INC., COMMUNITY HEALTHCARE NETWORK, DAMIAN
20    FAMILY CARE CENTERS, INC., EAST HARLEM COUNCIL FOR HUMAN
21    SERVICES, INC., EAST HILL FAMILY MEDICAL, INC., EZRA MEDICAL
22    CENTER, FAMILY HEALTH NETWORK OF CENTRAL NEW YORK, INC.,
23    FINGER LAKES MIGRANT HEALTH CARE PROJECT, INC., HERITAGE
24    HEALTH AND HOUSING, INC., HUDSON HEADWATERS HEALTH
25    NETWORK, HUDSON RIVER HEALTHCARE, INC., JOSEPH P. ADDABBO
26    FAMILY HEALTH CENTER, INC., MIDDLETON COMMUNITY HEALTH
27    CENTER, INC., MORRIS HEIGHTS HEALTH CENTER, MOUNT VERNON
28    NEIGHBORHOOD HEALTH CENTER, INC., NORTHERN OSWEGO COUNTY
29    HEALTH SERVICES, INC., NORTHWEST BUFFALO COMMUNITY HEALTH
30    CARE CENTER, OAK ORCHARD COMMUNITY HEALTH CENTER, INC.,
31    ODA PRIMARY HEALTH CARE CENTER, INC., OPEN DOOR FAMILY
32    MEDICAL CENTER, INC., ROCHESTER PRIMARY CARE NETWORK,
33    RYAN/CHELSEA-CLINTON COMMUNITY HEALTH CENTER,

1  SCHENECTADY FAMILY HEALTH SERVICES, INC., DBA HOMETOWN
2  HEALTH CENTER, SUNSET PARK HEALTH COUNCIL, INC., SYRACUSE
3  COMMUNITY HEALTH CENTER, INC., GREATER HUDSON VALLEY
4  FAMILY HEALTH CENTER, INC., URBAN HEALTH PLAN, INCORPORATED,
5  WHITNEY M. YOUNG, JR. HEALTH CENTER, WILLIAM F. RYAN
6  COMMUNITY HEALTH CENTER,
7
8                    *Plaintiffs--Appellants--Cross-Appellees,*
9
10        v.
11
12  M.D. NIRAV SHAH, in his Official Capacity as Commissioner, New York State
13  Department of Health, State of New York,
14
15                    *Defendant--Appellee--Cross-Appellant.*
16
17                    _____
18
19  Before: POOLER, HALL, and CARNEY, *Circuit Judges*.
20
21        Appeal from the United States District Court for the Southern District of

22  New York (Andrew L. Carter, Jr., *J.*). Plaintiffs, certain health-service providers

23  designated under federal law as Federally Qualified Health Centers ("FQHCs",

24  or "Health Centers") and a trade association representing a number of FQHCs

25  assert various challenges under 42 U.S.C. § 1983 to New York's methods of

26  reimbursing them for services they provide under Medicaid. They seek injunctive

27  relief to remedy these supposed shortcomings in New York's method for

28  providing Medicaid reimbursement for their provision of services under 42

2

1    U.S.C. § 1396a(bb). The Health Centers' suit, at present, names M.D. Nirav Shah,

2    Commissioner of the New York State Department of Health ("Commissioner"),

3    as defendant. On cross-motions for summary judgment, the district court for the

4    most part upheld the Commissioner's methods for reimbursing FQHCs for

5    services they provide pursuant to Medicaid, and granted prospective relief to the

6    Health Centers for reimbursement for certain services they provide to patients

7    enrolled with Medicaid Managed Care Organizations ("MCOs"). *Cmty. Healthcare*

8    *Ass'n of N.Y. v. N.Y. State Dep't of Health*, 921 F. Supp. 2d 130 (S.D.N.Y. 2013).

9          We agree with the district court that, by and large, there are no disputed

10   issues of material fact, and that summary judgment is therefore appropriate. *See*

11   Fed. R. Civ. P. 56(a). We further agree with the district court's approach to, and

12   analysis of, the majority of the issues before us. We thus affirm the grant of

13   summary judgment to the Commissioner on most issues involving his

14   methodologies for reimbursing FQHCs, and affirm the grant of summary

15   judgment to the FQHCs on issues involving their reimbursement for services

16   provided to MCO enrollees. However, we find that the district court erred in

17   concluding that there were no disputed issues of material fact with respect to the

18   Commissioner's methodology for calculating its prospective obligation to make a

3

1    wraparound payment to FQHCs that provide services pursuant to a contract

2    with an MCO, *see* 42 U.S.C. § 1396a(bb)(5). We therefore vacate in limited part the

3    district court's grant of summary judgment to the Commissioner and remand for

4    the district court to assess, after resolution of these factual disputes, the

5    compatibility of this methodology with 42 U.S.C. § 1396a(bb)(5).

6            Affirmed in part, vacated and remanded in part.

7                                    _____

8                            MATTHEW S. FREEDUS, Feldesman Tucker Leifer
9                            Fidell LLP, Washington D.C. (James L. Feldesman,
10                           Feldesman, Tucker Leifer Fidell LLP, Washington D.C.;
11                           David A. Koenigsberg, Mens Bonner Komar &
12                           Koenigsberg LLP, New York, NY, *on the brief*), *for*
13                           *Plaintiffs--Appellants--Cross--Appellees*.
14
15                           ANDREW W. AMEND, Assistant Solicitor General of
16                           Counsel (Eric T. Schneiderman, Attorney General of the
17                           State of New York; Barbara D. Underwood, Solicitor
18                           General; Richard P. Dearing, Deputy Solicitor General,
19                           *on the brief*), New York State Office of the Attorney
20                           General, New York, NY, *for Defendant--Appellee--Cross-*
21                           *Appellant*.
22
23   POOLER, *Circuit Judge*:

24           This case requires us to consider challenges to certain aspects of New

25   York's administration of its responsibilities under the federal Medicaid Act, 42

                                          4

1   U.S.C. § 1396a *et seq*. ("Medicaid Act" or "Medicaid Statute"). Plaintiffs, certain

2   health-service providers designated under federal law as Federally Qualified

3   Health Centers and a trade association representing a number of FQHCs

4   (together, "FQHCs" or "Health Centers") assert various challenges to New

5   York's methods of reimbursing them for services they provide under Medicaid.

6   They seek injunctive relief under 42 U.S.C. § 1983 to remedy these alleged

7   shortcomings in New York's method for providing Medicaid payments for the

8   services the Health Centers provide. The Health Centers' suit, at present, names

9   M.D. Nirav Shah, Commissioner of the New York State Department of Health,

10   ("Commissioner") as defendant.[1] On cross-motions for summary judgment, the

11   United States District Court for the Southern District of New York (Andrew L.

12   Carter, Jr., *J.*), for the most part upheld the Commissioner's methods for

13   reimbursing FQHCs for services they provide pursuant to Medicaid, but granted

14   prospective relief to the Health Centers for reimbursement for certain services

15   they provide to patients enrolled with Medicaid Managed Care Organizations

---

[1] As the district court noted, the Health Centers' initial suit named Richard F. Daines as defendant, as he was then Commissioner, and Shah took his place shortly after. We will maintain the district court's practice of referring to the defendant simply as the Commissioner. *Cmty. Healthcare Ass'n of New York v. New York State Dep't of Health*, 921 F. Supp. 2d 130, 132–33 n.1 (S.D.N.Y. 2013).

1   ("MCOs"). *Cmty. Healthcare Ass'n of New York v. New York State Dep't of Health*,

2   921 F. Supp. 2d 130 (S.D.N.Y. 2013).

3        We agree with the district court that, as to the questions presented on

4   appeal—with only one exception—there are no disputed issues of material fact,

5   and that summary judgment was therefore appropriate. *See* Fed. R. Civ. P. 56(a).

6   We further agree with the district court's approach to, and analysis of, the

7   majority of the issues before us. We thus affirm the grant of summary judgment

8   to the Commissioner on most issues involving his methodologies for reimbursing

9   FQHCs, and affirm the grant of summary judgment to the FQHCs on issues

10   involving their reimbursement for services provided to MCO enrollees.

11   However, we find that the district court erred in concluding that there were no

12   disputed issues of material fact with respect to the Commissioner's methodology

13   for calculating its prospective obligation to make a wraparound payment to

14   FQHCs that provide services pursuant to a contract with an MCO, *see* 42 U.S.C.

15   § 1396a(bb)(5). We therefore vacate in limited part the district court's grant of

16   summary judgment to the Commissioner and remand for the district court, after

17   resolution of these factual disputes, the compatibility of this methodology with

18   42 U.S.C. § 1396a(bb)(5).

19        Affirmed in part, vacated and remanded in part.

6

1                                    **BACKGROUND**

2         We are concerned here with two competing objectives: "the mission of

3 publicly-funded health clinics to provide a panoply of medical services to under-

4 served communities, on the one hand," *Cal. Ass'n of Rural Health Clinics v.*

5 *Douglas*, 738 F.3d 1007, 1009 (9th Cir. 2013), and the necessity that there be a

6 "measure of discretion [states have] in choosing how to expend Medicaid funds,"

7 *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002), on the other.

8 This measure of discretion, in turn, is premised on the recognition that states

9 receiving Medicaid funds must be permitted to develop Medicaid programs that

10 are responsive to the needs of their respective communities, so long as these

11 programs are consistent with federal Medicaid requirements, a statutory

12 arrangement that the Supreme Court has recognized as "designed to advance

13 cooperative federalism." *Wis. Dep't of Health and Family Svcs. v. Blumer*, 534 U.S.

14 473, 497 (2002). This cooperative arrangement is of a piece with what has long

15 been recognized as "one of the happy incidents of the federal system," namely,

16 "that a single courageous state may . . . serve as a laboratory; and try novel social

17 and economic experiments without risk to the rest of the country." *New State Ice*

18 *Co. v. Liebmann*, 285 U.S. 262, 386–87 (1932) (Brandeis, *J.*, dissenting). New York,

19 as the administrator of the country's largest and most expensive Medicaid

1    program—with an annual budget exceeding $50 billion dollars—is currently

2    engaged in such an experiment. In this pursuit, it has attempted to balance: the

3    needs of low-income patients served by Medicaid and other federal programs;

4    the missions, goals, and constituencies of health-care providers, in particular the

5    community health centers who are plaintiffs in this case; and the possibility of

6    achieving both cost-savings and better health outcomes that can result from

7    contracting with MCOs to provide Medicaid services. With limited reservations,

8    we conclude that federal law permits New York to pursue the path it has chosen.

9    **I.    Federally Qualified Health Centers as Medicaid Service Providers**

10    The federal government established the Medicaid program via the passage,

11    in 1965, of Title XIX of the Social Security Act, now codified at 42 U.S.C. § 1396 *et*

12    *seq*. Medicaid is one of two programs, along with Medicare, through which the

13    United States "subsidizes heath care for persons" other than federal employees.

14    *Wilson-Coker*, 311 F.3d at 133. Unlike Medicare, which primarily services the

15    elderly and the disabled and depends on "intermediaries[] who must apply a

16    uniform set of standards established by federal law . . . Medicaid . . . is designed

17    to partially compensate States for the costs of providing health care to needy

18    persons of modest income." *Id.* at 134 (internal citations omitted). Thus, "States

19    need not participate in the program, but if they choose to do so, they must

1    implement and operate Medicaid programs that comply with detailed federally

2    mandated standards." *Three Lower Cnties. Comm. Health Svcs., Inc. v. Maryland*, 498

3    F.3d 294, 297 (4th Cir. 2007) (internal quotation marks omitted).

4         The Secretary of the Department of Health and Human Services ("HHS") is

5    responsible for overseeing state compliance with federal standards for

6    implementing Medicaid programs. *N.J. Primary Care Ass'n, Inc. v. N.J. Dep't of*

7    *Human Svcs.*, 722 F.3d 527, 529 (3rd Cir. 2013). Within HHS, the Centers for

8    Medicaid and Medicare Services ("CMS") is responsible for exercising the

9    "delegated authority" to oversee state compliance with federal Medicaid

10   requirements. *Sai Kwan Wong v. Doar*, 571 F.3d 247, 250 (2d Cir. 2009) ("Congress

11   has entrusted the Secretary of HHS with administering Medicaid, and the

12   Secretary, in turn, exercises that delegated authority through the CMS."). To

13   determine state eligibility for Medicaid funds, the state "must submit a plan

14   detailing how the State will expend its funds." *Wilson-Coker*, 311 F.3d at 134. As

15   relevant here, "[o]ne federal requirement is that a state Medicaid plan provide

16   payment for services rendered by [FQHCs]." *Three Lower Cnties.*, 498 F.3d at 297.

17        The FQHC designation is also a creature of federal law. As Medicaid was

18   designed to ensure medical services for "needy persons of modest income,"

19   *Wilson-Coker*, 311 F.3d at 134, so also we have explained that FQHC grants were

9

1    similarly designed to ensure access to health services for "medically underserved

2    communities." *Id.* at 134 n.2. The constituencies served by Medicaid and by

3    FQHCs are not identical, however. "An FQHC is an entity receiving direct grants

4    from the United States to provide primary and other health care services to [these

5    underserved communities]. In addition to receiving direct grants, an FQHC can

6    also bill for providing Medicare or Medicaid services. This dual funding

7    mechanism allows the FQHC to allocate most of its direct grant dollars towards

8    treating those who lack even Medicare or Medicaid coverage." *Id.* (internal

9    citations omitted); *see also Three Lower Cnties.*, 498 F.3d at 297 ("[Plaintiff] is

10   therefore not only a 'health center' receiving funds under the Public Health

11   Service Act but also, by definition, an FQHC receiving funds under the federal

12   Medicaid program.").

13         From the creation of dual funding sources for FQHCs, in the form of direct

14   federal grants and indirect federal Medicaid dollars filtered through the states,

15   FQHCs faced regulatory problems that, at least in part, compromised their

16   mission to treat a constituency of "those who lack even . . . Medicaid coverage."

17   *Wilson-Coker*, 311 F.3d at 134 n.2. The federal grant program for FQHCs was

18   established in 1975, as Section 330 of the Public Health Services Act. *See* Special

19   Health Revenue Sharing Act of 1975, Pub. L. 94-63, § 501, 89 Stat. 304, now

1    codified at 42 U.S.C. § 254b. At the outset, the Ford Administration objected to

2    the program as one which would provide services that duplicate those

3    reimbursable under Medicare and Medicaid. S. Rep. 94-29, at 5--6, *reprinted in*

4    1975 U.S.C.C.A.N. 469, 472--73. Because of the overlapping mandate for Health

5    Centers, and the various statutory gaps that allowed for states to avoid full

6    payment to FQHCs for their service to Medicaid patients, the result for FQHCs

7    by 1989, was that

8           on average, Medicaid payment levels to [FQHCs] cover less than 70
9           percent of the costs incurred by the centers in serving Medicaid
10          patients. The role of the programs funded under section[] . . . 330 . . .
11          is to deliver comprehensive primary care services to underserved
12          populations or areas without regard to ability to pay. To the extent
13          that the Medicaid program is not covering the cost of treating its
14          own beneficiaries, it is compromising the ability of the centers to
15          meet the primary care needs of those without any public or private
16          coverage whatsoever.

17

18   H.R. Rep. No. 101-247, 392, *reprinted in* 1989 U.S.C.C.A.N. 1906, 2118. Congress

19   remedied this problem by legislating in 1989 that states receiving funds under

20   Medicaid would be required "to reimburse FQHCs for '100 percent . . . of [each

21   FQHC's] costs which are reasonable.'" *Three Lower Cnties.*, 498 F.3d at 297

22   (alterations and omission in original) (quoting 42 U.S.C.§ 1396a(a)(13)(C)

23   (repealed 2000)). "Congress' purpose in passing this . . . requirement was to

24   ensure that health centers receiving funds under § 330 . . . would not have to

1 divert Public Health Services Act funds to cover the cost of serving Medicaid

2 patients." *Id.*

3      The statutory scheme of reimbursement to FQHCs for services for which

4 they were entitled to reimbursement under Medicaid was changed again in 2000.

5 "To relieve health centers from having to supply new cost data every year,

6 Congress amended the Medicaid Act in 2000 to implement a new *prospective*

7 payment system based on historical costs plus a cost-of-living factor." *Id.* at 298

8 (emphasis in original). This is the system at issue in this case.

9      In pertinent part, the current statutory scheme requires that "the State plan

10 shall provide for payment [to FQHCs] for such services in an amount (calculated

11 on a per visit basis) that is equal to 100 percent of the average of the costs for the

12 center or clinic of furnishing such services during fiscal years 1999 and 2000

13 which are reasonable and related to the costs of furnishing such services, or

14 based on such other tests of reasonableness as the Secretary prescribes . . . ." 42

15 U.S.C. § 1396a(bb)(2). "This rate-setting mechanism is known as the Prospective

16 Payment System ("PPS")." *N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 529. The rate

17 for repayment is also indexed to keep pace with cost of living increases. 42 U.S.C.

18 § 1396a(bb)(3); *see also Three Lower Cnties.*, 498 F.3d at 298.

19

1      "The system of states reimbursing FQHCs for their Medicaid costs is

2      complicated considerably by the fact that many states . . . use a managed care

3      approach to running their Medicaid system." *Rio Grande Cmty. Health Ctr., Inc. v.*

4      *Rullan*, 397 F.3d 56, 62 (1st Cir. 2005). The use of managed care, according to the

5      Commissioner, "has become increasingly prominent in the Medicaid system

6      nationwide." The majority of Medicaid patients treated by FQHCs in New York

7      are in fact enrolled by an MCO. Under this system generally, the state does not

8      directly reimburse health service providers that serve Medicaid recipients.

9      Rather, the state enters into a contract with an MCO. The state then pays the

10     MCO for each Medicaid patient enrolled with it. The MCO, in turn, contracts

11     with a health service provider, such as an FQHC, to provide medical services to

12     its enrollees.  *See generally Rio Grande Cmty. Health Ctr.*, 397 F.3d at 62. The

13     Commissioner submits that the benefits of such arrangements include "costs

14     savings" that result "from an emphasis on preventive and primary care, as

15     opposed to emergency care, historically a principal means by which underserved

16     populations have accessed medical treatment."

17         The Health Centers, for their part, explain how federal law was designed to

18     encourage MCOs to contract with FQHCs for provision of Medicaid services to

19     MCO enrollees. Prior to the 1997 Balanced Budget Amendment ("BBA"), Pub. L.

13

1    No. 105-33, 111 Stat. 251, formerly codified at 42 U.S.C. § 1396a(13)(c)(1999),

2    MCOS were required by the Medicaid Act to reimburse FQHCs "the full amount

3    of the 100 percent reasonable cost" of providing services. *See generally N.J.*

4    *Primary Care Ass'n, Inc.*, 722 F.3d at 540–41. The current arrangement, however,

5    adopted in 1997 and now codified, with little amendment, at Section

6    1396a(bb)(5)(A), places the obligation on states to reimburse FQHCs as follows:

7    "In the case of services furnished by a[n] [FQHC] . . . pursuant to a contract

8    between the center . . . and a[n] [MCO] . . . the State plan shall provide for

9    payment to the center or clinic by the State of a supplemental payment equal to

10    the amount (if any) by which the [PPS] amount . . . exceeds the amount of the

11    payments provided under the contract." In short, if an FQHC contracts with an

12    MCO, and under this contractual arrangement an MCO pays the FQHC for

13    services at a rate that is less than the PPS rate, the FQHC must still be made

14    whole by the state. Furthermore, these "wraparound" payments are to be

15    distributed to FQHCs "in no case less frequently than every 4 months." *Id.*

16    § 1396a(bb)(5)(B).

17        The payment method for reimbursing FQHCs for services which they

18    provide pursuant to Medicaid may also be established by an "alternative

19    payment methodology." *Id.* § 1396a(bb)(6). This methodology may be used only

1   if it "is agreed to by the State and the [FQHC] and . . . results in a payment to the

2   [FQHC] which is at least equal to the amount otherwise required to be paid . . .

3   under this section." *Id.*

4   **II.    Methodologies for FQHC Reimbursement in New York**

5          The New York State Department of Health ("DOH") is the New York

6   entity responsible for administering New York's Medicaid program. In addition

7   to ensuring New York's Medicaid compliance with state law, the DOH must also

8   ensure New York's compliance with federal laws and regulations. After the

9   passage of 42 U.S.C. § 1396a(bb), New York passed corresponding state

10  legislation to meet its obligations to pay FQHCs at a PPS rate. *See* N.Y. Pub.

11  Health L. § 2807(8). Because the passage of Section 1396a(bb) also worked a

12  substantive change in the administration of state Medicaid programs, the DOH

13  was also responsible for submitting to CMS a State Plan Amendment ("SPA")

14  indicating how it would comply with the new method of prospectively

15  reimbursing FQHCs for providing Medicaid services. *See* 42 C.F.R. § 430.12(c).

16  Section 1396a(bb) was scheduled to be implemented for "services furnished on or

17  after January 1, 2001," 42 U.S.C. § 1396a(bb)(1). The DOH spent 2001 first

18  reviewing various billing practices of FQHCs during 1999 and 2000, and then

19  submitting various iterations of its SPA, SPA 01-03, proposing a PPS

1    methodology to CMS, in an effort to acquire approval. SPA 01-03 was approved

2    by CMS in April 2002. DOH also later submitted an additional proposed SPA,

3    SPA 06-11, to CMS proposing changes as to how FQHCs would be reimbursed

4    for providing certain offsite and group psychotherapy services, which was

5    approved by CMS in 2006.

6         Since the passage of Section 1396a(bb), New York has also made certain

7    other changes or updates to the ways in which FQHCs are to be compensated for

8    providing Medicaid services. In 2004, DOH issued guidance to FQHCs, among

9    other Medicaid service providers, in one of its periodic "Medicaid Updates"

10   ("Medicaid Update", or "2004 Update") urging that non-emergency dentist visits

11   should include both a cleaning and an exam as part of the same visit. The 2004

12   Update was issued because certain Medicaid service providers were performing

13   cleanings and examinations on separate visits, increasing the number of visits for

14   which it was possible to bill Medicaid. Finally, DOH has also implemented

15   various policies to satisfy its obligation to pay FQHCs a statutorily guaranteed

16   wraparound rate if the FQHC contracts with an MCO. 42 U.S.C. § 1396a(bb)(5).

17   Neither the dental billing update nor the calculation of New York's prospective

18   wraparound obligation was ever approved by CMS. These policies also have

19   never been promulgated officially as New York regulations.

1    **A.    CMS-Approved Methodologies**

2    Two of the payment methodologies challenged here, New York's general

3    PPS rate and its PPS rate for certain offsite services provided by FQHCs, have

4    been specifically approved by CMS pursuant to its authority to review

5    amendments to state plans. 42 C.F.R. § 430.12.

6

7    **1.    New York's PPS Rate**

8    Both parties are in agreement on the content of New York's PPS rate. As

9    the district court explained:

10       In New York, the PPS rate for reimbursement to FQHCs is the lower
11       of allowable costs, as defined by state regulations, or the applicable
12       peer group ceiling. [DOH] first considers each FQHCs patient care
13       costs ("allowable costs") from two base years. DOH then classifies
14       allowable costs as either capital or operating costs and further
15       classifies the operating costs into six categories [including
16       administrative, patient transportation, medical, dental, and therapy,
17       and ancillaries]. The six categories of operating costs are divided by
18       the total number of patient visits to the FQHC, yielding the FQHC's
19       average per-visit costs. The average per-visit costs are compared to
20       ceilings, based on the operating costs of other diagnostic and
21       treatment centers, including non-FQHCs, located in the same region
22       (upstate rural, upstate urban and downstate). The ceiling is 105% of
23       the peer group's average costs, by service category.

24
25    *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 134.

26

Case 13-171   Document 139   Page: 18   10/17/2014   1367897   71

2.      **New York's Rate for Offsite and Group Psychotherapy Services**

CMS has also approved a specific New York PPS rate for certain services

that FQHCs provide offsite. Again, the district court ably summarized the

content of this rate in proceedings below, and the parties do not dispute it.

> CMS approved reimbursement of group therapy and offsite services
> performed by FQHCs at special rates, lower than the full PPS rates[]
> . . . CMS permitted rates of payment for group psychotherapy and
> offsite services to be calculated using elements of the
> CMS-promulgated Resource Based Relative Value Scale.
> Furthermore, CMS required Medicaid reimbursement for offsite
> services only if provided to existing patients of the FQHC and where
> the offsite services were necessitated by health or medical reasons.

*Id.*

**B.      2004 Medicaid Update Regarding Provision of Dental Services**

The DOH periodically issues "Medicaid Updates." These updates

"address, among other things, guidelines and policies for Medicaid billings and

payments." App'x at 460–61. In the 2004 Update the DOH advised clinics as

follows.

> Non-emergency initial visits should include a cleaning, x-rays (if
> required), and a dental exam with a definitive treatment plan.
> *Generally, this should be accomplished in one visit.* However, in rare
> instances, a second visit may be needed for completion of these
> services. We would expect a notation in the record to indicate the
> reason for a second visit.

1     App'x at 471 (emphasis in original).

2     The concept of a "visit" is central to managing Medicaid costs. As the

3     Commissioner explains, basing Medicaid reimbursement to centers on visits

4     rather than discrete services "reflects a policy that the services provided in a visit

5     to a clinic should be determined by the medical needs and circumstances of a

6     patient, rather than the clinic's desire to maximize reimbursement."

7     The parties here disagree as to whether DOH's 2004 Update worked a

8     change in billing practices by FQHCs with respect to reimbursement under

9     Medicaid for the provision of dental services. Plaintiffs assert that "[w]hen PPS

10    rates were calculated for plaintiff health centers, using the center's 1999 and 2000

11    reasonable costs, the health centers were then providing dental examinations and

12    cleanings during separate visits." The result, according to the Health Centers, is

13    that "the State's consolidation requirement . . . has an effect that violates the

14    federal law governing the manner in which an FQHC must be reimbursed by the

15    Medicaid program (§ 1396a(bb)). That is, it changes what was in fact two visits

16    (in the base years) to one visit without an adjustment to the affected FQHC's per

17    visit rate (to account for the resulting higher cost per visit)."

18    The Commissioner disputes the evidentiary basis for the Health Centers'

19    claim that scheduling cleanings and examinations on separate visits was common

1  practice in 1999 and 2000. Additionally, the Commissioner claims that "[t]he

2  guidance did not represent any change in policy; it merely made clear that any

3  FQHCs that were scheduling separate visits for . . . the related services of dental

4  cleanings and examinations [were doing so] contrary to longstanding DOH

5  regulations."

6  **C.   New York's Methodology for Determining the Wraparound Rate**
7       **in the Case of FQHC and MCO Contracting**

8       **1.     Prospective Calculation of the Wraparound Rate**

9       Section 1396a(bb)(5) also includes specific requirements for the states to

10  provide supplementary, or "wraparound," payments to FQHCs in the event that

11  the FQHCs provide services pursuant to a contract with an MCO. New York has

12  never received specific approval from CMS for any iteration of its methodology,

13  past or present, for calculating the wraparound payments that are owed to

14  FQHCs. As the district court explained, the final SPA submitted to CMS included

15  terminology with respect to the supplemental payment obligation "that . . .

16  largely mimics the text of 42 U.S.C. § 1396a(bb)(5) . . . . CMS did not approve a

17  special methodology for supplemental payments." *Cmty. Healthcare Ass'n of New*

18  *York*, 921 F. Supp. 2d at 141-42. The Commissioner does not argue on appeal that

19

1      its current methodology for calculating the supplemental payment is entitled to

2      the same deference due one approved by CMS.

3              The current wraparound payment methodology employed by New York is

4      prospective. As the district court explained, the methodology for calculating the

5      Supplemental Payment is laid out in the "NYS Managed Care Supplemental

6      Payment Program for FQHCs Policy Document" ("Supplemental Payment

7      Program"). *Id.* at 134. This supplemental payment "is the average difference

8      between what that FQHC is paid by contracted MCOs and its specific blended

9      medicaid rate for each year." App'x at 629--30. That rate "is a weighted average

10     of the center's PPS rate, offsite service rate, and group counseling rate." *Cmty.*

11     *Healthcare Ass'n of New York*, 921 F. Supp. 2d at 135.

12             The Health Centers object to the use of this rate on two grounds. The first

13     objection is that, because Section 1396a(bb)(5) requires that the wraparound

14     payment be "equal to" the difference between the amount paid, for each visit, to

15     the FQHC by the MCO and the amount owed the FQHC under the PPS rate, New

16     York cannot merely estimate its prospective wraparound payment using the

17     previous years' MCO visits and payments. Such estimates, the plaintiffs  contend,

18     cannot satisfy the statutory meaning of "equal to" as it is used in Section

19     1396a(bb)(5).

1        The second objection is to how New York collects the information it uses to

2     calculate the wraparound rate. The FQHCs submit to DOH a Managed Care Visit

3     and Revenue Report ("MCVR Report"), which documents the previous year's

4     MCO visits and repayments. The FQHCs allege that the MCVR Report does not

5     allow the FQHC to report a visit during which the FQHC provided services for

6     which the MCO did not reimburse the FQHC. Thus, there is no provision for an

7     FQHC to report certain visits to the DOH such that they might be included in the

8     calculation of the prospective year's wraparound rate. The Health Centers allege

9     that this reporting gap results in systematic underpayment to the FQHCs. The

10     Commissioner, for his part, submits that FQHCs can put in a claim for a

11     supplemental payment even if the MCO has not reimbursed the FQHC at the

12     time the supplemental payment request is made.

13         **2.**     **MCO Non-Payment and Administrative Challenges**

14        The inability of FQHCs to report to DOH on visits which did not result in

15     MCO payment for the purposes of New York's wraparound rate calculus is also

16     related to two independent challenges by the Health Centers with respect to New

17     York's obligations under Section 1396a(bb)(5). The Health Centers argue that

18     New York fails to provide any avenues by which the Health Centers can

19     challenge an MCO for non-payment for services. The result is that not only is

1    New York's prospective calculation of the supplemental payment short, but also

2    that the service provided by the FQHC will not qualify as a service provided

3    "pursuant to a contract" with an MCO, and thus not qualify for a supplemental

4    payment under Section 1396a(bb)(5). The FQHCs argue they are left footing the

5    entirety of the bill for services which they provided.

6            The Health Centers bring a final challenge under Section 1396a(bb). They

7    argue that there is no provision for payment to FQHCs in the event that the

8    Centers provide services to an MCO enrollee that is outside of the network of the

9    MCOs. The Commissioner argues that New York's contracts with MCOs place

10   this payment burden on MCOs, and thus MCOs are obligated to pay for these

11   services.  The Commissioner argues that Congress has made this option available

12   to it under 42 U.S.C. § 1396b(m), which provides in relevant part

13           that, in the case of medically necessary services which were
14           provided (I) to an individual enrolled with the entity under the
15           contract and entitled to benefits with respect to such services under
16           the State's plan and (II) other than through the organization because
17           the services were immediately required due to an unforeseen illness,
18           injury, or condition, either the entity or the State provides for
19           reimbursement with respect to those services.
20
21   42 U.S.C. § 1396b(m)(2)(A)(vii). The Commissioner argues that this provision of

22   the Medicaid Act governing state-MCO contracting trumps the provisions of the

23

1    Medicaid Act requiring full reimbursement to FQHCs for the services they

2    provide, as mandated by Section 1396a(bb).

3    **III.    Proceedings Below**

4          **A.    Summary Judgment**

5          After discovery, both parties cross-moved for summary judgment. The

6    district court, in a thorough and cogent opinion, granted partial summary

7    judgment and denied partial summary judgment to both parties. In addressing

8    the FQHCs' challenge to New York's PPS methodology, the district court

9    determined that "[s]ince the statute is ambiguous, the starting place is . . .

10   whether the federal agency has approved a permissible construction of the

11   Medicaid Act." *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 139. With

12   respect to the Health Centers' challenge to New York's use of peer group ceilings,

13   the district court noted that CMS had specifically asked the Commissioner to

14   justify such an approach, and that the Commissioner had "responded that CMS

15   had previously approved the use of peer group ceilings." *Id.* It noted that "CMS

16   addressed all of the concerns that Plaintiffs now try to argue merit dismissal of

17   the peer group ceilings . . . and still approved the SPA." *Id.* Thus, the district

18   court concluded that "the interpretation of the statute to allow peer group

19

24

1    ceilings . . . is, at the very least, a plausible one." *Id.* It granted summary

2    judgment to the Commissioner on this issue.

3          With respect to the Health Centers' challenge to the reimbursement for

4    offsite and group therapy services, the district court again noted that "Congress's

5    intent about how offsite services and group therapy should be reimbursed is not

6    explicitly set forth in the Medicaid statute," and thus reasoned that it would

7    "grant deference to CMS's approval of" SPA 06-11 "setting reimbursement rates

8    for these services. *Id.* at 140. It concluded that "the prior approval of CMS yielded

9    a permissible construction that offsite services and group therapy services could

10   be reimbursed at special rates that this court should not disrupt." *Id.* It granted

11   summary judgment to the Commissioner on this issue as well.

12         With respect to the challenge to 2004 Update setting forth guidance on

13   billing practices for dental services, the district court reasoned that "this

14   statement in no way represents a new policy . . . but rather the optimal standard

15   of care." *Id.* at 147. Noting that FQHCs are entitled only to "costs that are

16   reasonable," *id.* at 147 (citing 42 U.S.C. § 1396a(bb)), the district court granted

17   summary judgment to the Commissioner on this issue.

18         The district court next considered the challenges raised to New York's

19   supplemental payment methodology. It first concluded that CMS had not

1    considered the methodology being challenged, and that it would thus review

2    New York's development of this methodology de novo. *Id*. at 142. With respect to

3    the substantive validity of the Supplemental Payment Program, the district court

4    rejected the Health Centers' argument that "there is a simple mathematical

5    equation for determining supplemental payments." *Id.* at 143. Noting the

6    "multiple possibilities for calculating the PPS rate for any FQHC," the district

7    court concluded that the "range of options does suggest that States might retain

8    some flexibility in how to adopt their own approaches in rate setting." *Id.* at

9    143–44. Having rejected the Health Centers' objection to a prospective approach

10   to supplemental payment obligations as such, the district court noted that

11   specific challenges based on the PPS rate and the rate of payment for offsite

12   services had federal approval, and thus the supplemental payment methodology

13   was not invalid on those grounds either. *Id.* at 144. It thus granted summary

14   judgment to the Commissioner.

15       Next, the district court considered New York's policies with respect to non-

16   payment to FQHCs by MCOs. The district court determined that "the fact that

17   there is no mechanism by which FQHCs are reimbursed for services actually

18   furnished under MCO contract and not paid by the MCO is troublesome and in

19   clear contravention of the plain language of 1396a(bb)(5)." *Id.* at 145. It continued

26

1    as follows:

2              [T]he FQHC is the clear beneficiary of the statute and the State has a
3              clear responsibility to make a supplemental payment "in the case of
4              services furnished by a FQHC." This supplemental payment must be
5              equal to the amount by which the PPS rate exceeds the payments
6              provided under the contract. Notably, the phrase "payments
7              provided under the contract" permits deduction only of amounts
8              *actually* paid by the MCO to the FQHC. Whether or not the MCO
9              makes a payment, the State is responsible for the supplemental
10             payment (which may in fact be the entire PPS rate, if the MCO fails
11             to make a payment).

13             There is no basis for the State's conclusion that the FQHC must
14             accept the loss because the MCO denied payment for an otherwise
15             legitimate visit. Determining the amount the MCO will pay is
16             certainly necessary for the calculation of supplemental payments,
17             but the MCO's determination of validity cannot be the end of the
18             inquiry. There are many reasons why a MCO might not pay an
19             otherwise valid claim.

21             To prevent fraudulent claims as the State certainly has an interest in
22             doing, these payments might properly be reserved for a more robust
23             audit or administrative process. The current audit process by DOH's
24             Bureau of Managed Care Certification and Surveillance is only
25             available "on the grounds that the health care service is not
26             medically necessary or is experimental or investigational." N.Y.
27             Comp. Codes R. & Regs. tit. 10, § 98–2.1 (2013).

29    *Id.* (some internal citations omitted). The district court granted summary

30    judgment to the Health Centers on this issue and enjoined the Commissioner's

31    policy "until modified in the manner set forth in this Opinion." *Id.*

32             Turning to the issue of out-of-network reimbursement, the district court

1 similarly concluded that "in the absence of a contract with an MCO, the State

2 instead is wholly responsible for the reasonable costs of the FQHC at the

3 prevailing PPS rate." *Id*. However, given that Section 1396b(m)(2)(A)(vii) allows

4 the state to contractually allocate to the MCO the obligation to pay for services

5 provided by out-of-network FQHCs, the district court reasoned that "[t]here is a

6 conflict (or at least a substantial loophole) in the understanding of the Medicaid

7 framework and the State-MCO contract." *Id*. at 146. This is because under Section

8 1396a(bb)(5), the state is responsible for a gap between MCO and FQHC payment

9 (in the form of the supplemental payment) but, in the case of out-of-network

10 services, the state delegated FQHC payment to an MCO. *Id.* The district court

11 reasoned that "the burden of this loophole should never fall on FQHCs, which

12 are covered by the federal statute for their services." *Id.* The district court thus

13 enjoined "[t]he State's failure to pay for out-of-network services not paid by the

14 MCO." *Id.* at 147.

15      Finally, the district court found that the balance of equities favored

16 injunctive relief, *id.* at 148, and this determination is not challenged by the

17 Commissioner on appeal.

18 **B.   Injunctions**

19      Following its decision on summary judgment, the district court ordered the

1    Commissioner to submit a "plan of action . . . that, in the event of non-payment

2    by the MCO, provides for (1) full reimbursement to FQHCs for services

3    provided, subject to verification by the Commissioner; and (2) full

4    reimbursement to FQHCs who provide Medically Necessary Services."  Special

5    App'x at 31. The district court approved New York's proposed plan on July 26,

6    2013. Special App'x at 34. There is no appeal from this order, and its scope and

7    particulars are not before us.

8          The Health Centers now appeal the various grants of summary judgment

9    to the Commissioner, and the Commissioner cross-appeals the grants of

10   summary judgment to the Health Centers.

11                            **STANDARD OF REVIEW**

12         We review the grant of summary judgment de novo. *Westport Bank & Trust*

13   *Co. v. Gerahty*, 90 F.3d 661, 668 (2d Cir. 1996). Summary judgment is appropriate

14   where "there is no genuine dispute as to any material fact and the movant is

15   entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As in such a motion

16   before the district court, on appeal "[t]he evidence of the non-movant is to be

17   believed, and all justifiable inferences are to be drawn in his favor." *Anderson v.*

18   *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

19

29

1    **DISCUSSION**

2  I.  **New York's CMS-Approved Methodologies for PPS Payments are**
3      **Entitled to Deference**

4          The Health Centers are challenging two methods for Medicaid

5  reimbursement—the general PPS reimbursement rate developed by the DOH,

6  and the special PPS rate for certain other services—which CMS specifically

7  approved as amendments to the state plan. As eventually codified in New York,

8  the general reimbursement rate was established by "grouping facilities to

9  establish cost center ceilings" on a geographic basis. 10 N.Y.C.R.R. § 86-4.14(d).

10 The cost center ceilings are "computed at 105 percent of the adjusted weighted

11 average base year costs of the facilities in the cost center group." 10 N.Y.C.R.R.

12 86-4.14(c). Of course, if an FQHC was operating at less than the peer group

13 ceiling at the time that DOH was implementing its PPS methodolgy, then its per-

14 visit rate for services reflects "that center's actual operating costs per visit."

15 App'x at 485.

16         The entirety of this methodology, and more, was proposed by New York,

17 and reviewed by CMS, in a series of eight letters exchanged between March 29,

18 2001, and April 12, 2002. DOH first submitted SPA 01-03, proposing the general

19 PPS methodology implementing the prospective change for FQHC

1      reimbursements to CMS on March 29, 2001. CMS asked specifically what "the

2      State's proposed methodology . . . [PPS], or an alternative methodology? If New

3      York chooses the PPS methodology, it should explain its derivation. . . . If the

4      State chooses to implement an alternative methodology, the methodology must

5      be agreed to by the State and each center/clinic." App'x at 308. After a series of

6      letters between DOH and CMS, which further clarified CMS's concerns and

7      required DOH to make certain adjustments to its proposed amendment, on

8      February 5, 2002, CMS explicitly requested information regarding the use of both

9      peer-group ceilings, and an explanation of the reasons for reimbursing FQHCs at

10     a rate that was "the lower of" the 105 percent reimbursement and a given center's

11     average costs. App'x at 330. On March 18, DOH responded, "Peer groups are

12     established by grouping facilities offering similar types of services and having

13     similar regional economic factors." App'x at 335. Explaining the 105 percent cost

14     ceiling, DOH explained that it "allows for variability of costs within the peer

15     group." *Id.* In its next letter, CMS approved SPA 01-03 on April 12, 2002.

16          DOH submitted SPA 06-11, for CMS approval on February 27, 2006. Now

17     codified at 10 N.Y.C.R.R. 86-4.9(h)-(i), this amendment proposed to make FQHCs

18     eligible for receiving reimbursement for providing group psychotherapy and

19     offsite services. Both of these services are reimbursed at a rate which DOH

Case 13-171   Document 139   Page: 32   10/17/2014   1357827   71

1    calculates "using elements of the [Resource] Based Relative Value System

2    (RBRVS) promulgated by [CMS]." App'x at 379. CMS asked for further guidance

3    regarding the exact methodology that DOH would apply to calculate the value of

4    these services, and the DOH responded by laying out for CMS the precise

5    formula it would apply in order to derive the payment rate for group

6    psychotherapy and offsite services. On October 30, 2006, CMS approved SPA 06-

7    11.

8         We have not yet spoken on the proper level of deference that we are to

9    afford to CMS in a case such as this, namely, where CMS has specifically

10   approved, after consultation with a state agency, the state's adoption of an SPA.

11   The closest that we have come to the issue is *Wilson-Coker*, where we were called

12   to determine the deference owed to a state plan that incorporated a CMS-

13   developed, though not officially-promulgated, "productivity screen." *Wilson-*

14   *Coker*, 311 F.3d at 134-35. A "productivity screen" is "[a] productivity standard

15   [that] imposes a minimum visit requirement on affected providers, [such that] if a

16   health care provider does not meet or exceed the minimum number of patient

17   visits per year, its reimbursement is reduced in proportion to the amount by

18   which the provider feel short of the minimum." *Id.* at 134-35. Connecticut passed

19   legislation to implement this screen, but state regulations to reflect these changes

1    were not implemented until 2001, at which point CMS approved the use of

2    screens. Plaintiff, an FQHC, challenged the use of screens during 1999 and 2000,

3    which was relevant because those were the two baseline years for implementing

4    a PPS methodology under Section 1396a(bb)(2), and as a result "shortfalls in that

5    period will result in a reduction in the amount of money [an FQHC] receives in

6    the future for each visit." *Id.* at 136. We considered what would constitute a

7    "reasonable cost" under Section 1396a(bb)(2), and specifically, whether a

8    limitation based on a "productivity screen" could constitute such a cost. We

9    noted that the phrase "reasonable costs" was ambiguous, *id.* at 137, and that "[i]n

10   resolving this ambiguity, we owe some significant measure of deference to CMS's

11   interpretation of the statute, although we need not decide the exact molecular

12   weight of the deference we accord to CMS's position," *id.* at 137-38. We then

13   reversed the decision of the district court on the ground that its interpretation of

14   reasonable and related costs was inconsistent with CMS's position. *Id.* at 139. The

15   general lesson of *Wilson-Coker*, then, is that CMS's interpretation is probative of

16   the meaning of the repayment provisions to FQHCs laid out in Section 1396a(bb).

17       Other circuits to consider this issue have been unanimous in holding that a

18   CMS decision approving an SPA is entitled to deference under *Chevron, U.S.A.,*

19   *Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Managed*

33

1     *Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1240 (9th Cir. 2013) ("[T]he Secretary's

2     approval of California's requested reimbursement rates . . . is entitled to

3     deference under *Chevron*."); *Christ the King Manor, Inc. v. Sec'y of U.S. Dep't of*

4     *Health and Human Servs.*, 730 F.3d 291, 307 (3rd Cir. 2013) ("SPA approvals are . . .

5     the type of agency action that warrants *Chevron* deference . . . ."); *Harris v.*

6     *Olszewski*, 442 F.3d 456, 467 (6th Cir. 2006) ("[T]he agency's approval of the state

7     plan amendment is entitled to *Chevron* deference."); *Pharm. Research and Mfrs. of*

8     *America v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004) (holding the "Secretary's

9     interpretations of the Medicaid Act are . . . entitled to *Chevron* deference").

10     "[A]dministrative implementation of a particular statutory provision

11     qualifies for *Chevron* deference when it appears that Congress delegated

12     authority to the agency generally to make rules carrying the force of law, and that

13     the agency interpretation claiming deference was promulgated in the exercise of

14     that authority." *United States v. Mead Corp.*, 533 U.S. 218 226-27 (2001); *see also*

15     *Christ the King Manor, Inc.*, 730 F.3d at 306. And, while the Supreme Court has not

16     spoken directly on the issue, in *Douglas v. Independent Living Center of Southern*

17     *Calif.*, "the Supreme Court said that '[t]he Medicaid Act commits to the federal

18     agency the power to administer a federal program,' and that, in approving a[n]

19     SPA 'the agency has acted under [that] grant of authority.'" *Christ the King Manor,*

1     *Inc.*, 730 F.3d at 306 (alterations in original) (quoting 132 S. Ct. 1204, 1210 (2012));

2     *see also Managed Pharmacy Care*, 716 F.3d at 1246.  Thus, agency approval "'carries

3     weight,' especially when 'the language of the particular provision at issue . . . is

4     broad and general.'" *Christ the King Manor, Inc.*, 730 F.3d at 306 (omission in

5     original) (quoting *Douglas*, 132 S. Ct. at 1210). We find the reasoning of our sister

6     circuits on this issue persuasive. And this reasoning compels the conclusion that

7     New York's CMS-approved PPS methodolgies are permissible under Section

8     1396a(bb).

9        Under the familiar two-part *Chevron* analysis, we are "require[d] to abide

10     by an agency's interpretation or implementation of a statute it administers if

11     Congress has not directly spoken 'to the precise question at issue' and if the

12     agency's answer is 'permissible' under the statute." *Managed Pharmacy Care*, 716

13     F.3d at 1246 (quoting *Chevron*, 467 U.S. at 842-43); *see also Sash v. Zenk*, 428 F.3d

14     132, 136–38 (2d Cir. 2005) (applying two-step *Chevron* framework to ambiguous

15     statute governing good behavior credits for federal prisoners).

16        It is beyond debate that Congress did not speak precisely as to the

17     methodology for calculating the PPS rate in Section 1396a(bb)(2). We have

18     already held as much with respect to Section 1396a(bb)(1), which requires that

19     "the State plan shall provide for payment for services" furnished by FQHCs, but

1    does not specify a particular payment method for states to use. *Wilson-Coker*, 311

2    F.3d at 139. Section 1396a(bb)(2), as well, includes the same language regarding

3    the state's obligation to provide for payment, but specifies that this payment

4    must be "equal to 100 percent of the average of the costs of the center or clinic . . .

5    during fiscal years 1999 and 2000 which are reasonable and related to the costs of

6    furnishing such services, or based on such other tests of reasonableness as the

7    Secretary prescribes in regulations." The Secretary has not provided such tests of

8    reasonableness. *Wilson-Coker*, 311 F.3d at 137, leaving us with the alternative

9    provision of Section 1396a(bb)(2). Congress did not prescribe any single method

10   as the only way in which states would be permitted to calculate average

11   reasonable and related costs. In Section 1396a(bb)(2), Congress has left this to the

12   states and CMS to develop, in trusting the partnership and spirit of "cooperative

13   federalism" that Medicaid envisions, *Wis. Dep't of Health and Family Svcs.*, 534 U.S.

14   at 496, to result in a methodology which will give meaningful and appropriate

15   content to the term.

16        It remains for us to determine, then, whether CMS, in approving an SPA

17   that made arrangements for calculating average costs based on a methodology

18   that imposed cost-ceilings based on regional groupings was approving a PPS

19   methodology that was "permissible" within the meaning of Section 1396a(bb).

1    *Chevron*, 467 U.S. at 842-43. We have no problem concluding, as the district court

2    did, that such an approach is well within the range of permissible readings of the

3    statute. Nothing in the statutory FQHC-reimbursement provisions forbids states

4    from grouping similar FQHC providers in its initial analysis of services provided

5    during 1999 and 2000. The mere fact that the FQHCs believe these groupings to

6    be arbitrary does not establish that they are impermissible under Section

7    1396a(bb)(2); this is especially true given that the FQHCs have produced no

8    evidence at summary judgment that such groupings actually result in FQHCs

9    being reimbursed at a rate less than that required to cover their costs of providing

10   services. Indeed, even if they did, an individual FQHC could still appeal for an

11   adjustment to this reimbursement if the services it provides are "unique within

12   [its] peer group." App'x at 211.

13       We affirm the district court's judgment with respect to SPA 06-11, also

14   approved by CMS, for substantially similar reasons. It is clear that the Medicaid

15   Act does not speak directly to the question of how to reimburse FQHCs for the

16   offsite and group psychotherapy services covered in SPA 06-11, and in light of

17   the Commissioner's submission that such services ought to be reimbursed at a

18   lower rate because they "do not present the same costs for an FQHC that a

19   standard individual clinic does," an assertion that goes unchallenged by the

37

1    Health Centers, we think such a policy entirely permissible under the statute,

2    *Chevron*, 467 U.S. at 842-43.

3         The Health Centers mount an additional collateral attack on CMS's

4    approval of this special rate for offsite and group therapy services. They assert

5    that this special PPS rate must be analyzed under Section 1396a(bb)(6) rather than

6    Section 1396a(bb)(2). Section 1396a(bb)(6) allows for a state to make

7    reimbursement to FQHCs for services "under an alternative payment

8    methodology that—(A) is agreed to by the State and the center . . . ; and (B)

9    results in a payment to the center . . . of an amount which is at least equal to the

10   amount otherwise required to be paid to the center . . . under this section." The

11   Health Centers assert that the special PPS rate is an alternative payment

12   methodology and that, because they have not agreed to it, it is invalid under this

13   provision.

14        The Health Centers' reading of the statute is simply untenable. The statute

15   contemplates three methods for FQHC reimbursement: first, through the general

16   PPS rate set by states with CMS approval, 42 U.S.C. § 1396a(bb)(2); second,

17   through reimbursements that are "based in such other tests of reasonableness as

18   the Secretary prescribes," *id.*; and third, through a general "alternative payment

19   methodology" whose availability is codified at Section 1396a(bb)(6). Thus Section

1396a(bb)(6) cannot be read to modify the provisions of a general PPS rate under

Section 1396a(bb)(2). Rather, "alternative" means what it says, namely, that

Section 1396a(bb)(6) allows states and FQHCs, if in agreement with one another,

to eschew the PPS methodology of Section 1396a(bb)(2) altogether. *See Pee Dee*

*Health Care, P.A. v. Sanford*, 509 F.3d 204, 207 (4th Cir. 2007) ("The Medicaid Act . .

. allows for two methods of reimbursement. The first method is a 'prospective

payment system' based on historical-average costs plus a cost-of-living factor. 42

U.S.C. § 1396a(bb)(2). The second method, set forth in § 1396a(bb)(6), authorizes

an 'alternative payment methodology' that can take a number of forms."

(footnote omitted)); *Rio Grande Cmty. Health Ctr., Inc.*, 397 F.3d at 62 (describing

requirements of Sections 1396a(bb)(2)--(3) and noting that "[a] state may only

deviate from the very specific payment methodology of the PPS if the FQHC

involved gives its consent and there is no reduction in the total payments made

as compared to the PPS method"). The Health Centers' contrived reading of

Section 1396a(bb)(6) would make every deviation in payment for provision of

separate services an "alternative payment methodology." We reject such a

reading.

  "We take care not lightly to disrupt the informed judgments of those who

must labor daily in the minefield of often arcane policy, especially given the

1    substantive complexities of the Medicaid statute." *Wilson-Coker*, 311 F.3d at 138.

2    The Health Centers fail to explain why we ought to abandon this principle here.

3    Despite every opportunity to produce evidence that the decisions at issue

4    impacted their bottom line, they are left at this point only with the bald assertion

5    that New York's methodology in aggregate costs them millions of dollars. But

6    this assertion is not tethered to any evidence in the record, but only to DOH

7    documents calculating each Center's original PPS rate. This evidence does not

8    create a genuine dispute of material fact as to whether the FQHCs actually have

9    been shortchanged under the PPS system. It certainly does not provide us with

10    justification to upset the considered determination of DOH and CMS.

11  **II.    The State's 2004 Guidance Letter Regarding Payment for Dental Services**
12       **Did Not Work an Unreasonable Change on the Baseline Calculation for**
13       **Payment for Services During the 1999 and 2000 Fiscal Years**

14         The Health Centers next argue that the 2004 Medical Update, which

15    encouraged all Medicaid service providers (not just FQHCs) to provide dental

16    cleaning and examination services during the same visit is unlawful. FQHCs may

17    still be reimbursed for cleaning and examination services provided on separate

18    visits. However, the billing statement must include a notation that explains why

19    services were offered on separate visits.

20

1    The Health Centers argue that this change works an effect on the rates set,

2    because "it changes what was in fact two visits (in the base years [1999 and 2000])

3    to one visit without an adjustment to the affected FQHC's per visit rate (to

4    account for the resulting higher cost per visit)."

5    We disagree with the Health Centers that the change worked by New

6    York's 2004 Medicaid Update results in an impermissible state policy under

7    Section 1396a(bb)(2). The Health Centers direct us to absolutely no language in

8    the statute, nor to a principle of interpretation, that would help us to recognize

9    their contention regarding New York's dental billing practices guidance as a legal

10   argument, rather than a mere observation.[2]

11   The Health Centers argue that they may succeed in challenging New

12   York's dental billing practices "even if the State's consolidation requirement

13   reflects the proper standard of care." This argument verges on the self-refuting.

---

[2] The Health Centers argue that this policy worked a change in Medicaid repayment, and point out this change was without CMS approval. However, they do not argue they have a cause of action to challenge this putative procedural shortcoming. We note, though we need not hold, that there likely is no such cause of action. *See N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 538–39 (collecting cases and holding that no private right of action existed under Section 1983 to bring challenges to the state's failure to seek CMS approval to a change in state programs); *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 547–49 (9th Cir. 2011). For similar reasons, we do not pass on FQHC's assertions that the DOH's Supplemental Payment Program was a change requiring CMS approval. *Infra* at [48-54].

1    Section 1396a(bb)(2) contemplates only reimbursement for the "reasonable and

2    related costs" of providing services to FQHC patients. We may grant the Health

3    Centers' argument that their "literal heap of evidence" established that it was the

4    practice of Health Centers with dental clinics to bill for separate visits for dental

5    examinations and teeth cleanings (a proposition on which we remain agnostic).

6    However, there is no evidence in the record that such a practice conformed with

7    the proper standard of care. And the Commissioner has submitted evidence that

8    there are at least two justifications for requiring these services to be provided in a

9    single visit. First, it decreases the transportation costs of each visit, which

10   Medicaid is required to reimburse. Second, the Commissioner argues that a

11   multi-visit policy results in inconvenience to patients, who are forced to make

12   multiple trips when one would suffice.

13        Even construing this evidence in the light most favorable to FQHCs on this

14   point, as we must, we have no difficulty concluding that requiring FQHCs to

15   provide two dental services in a single visit, or explain why it did not do so, is an

16   eminently "reasonable" requirement under Section 1396a(bb)(2). As such, even if

17   the FQHCs were providing these services in two visits during 1999 and 2000,

18   New York cannot be required to make an adjustment to a Health Center's PPS

19   rate based on this set of circumstances. The mere fact that FQHCs were engaging

1    in practices that led DOH, perhaps mistakenly, to credit them for costs not

2    reasonably related to the provision of services during the time that the DOH was

3    calculating PPS rates for FQHCs does not mean that FQHCs were entitled to rely

4    on that unreasonable practice in perpetuity. So long as the current rate, and

5    application of New York billing practices, reflects only "reasonable" costs, it is in

6    compliance with Section 1396a(bb)(2).

7          To be fair to the FQHCs, we note that there might well be important

8    justifications for an FQHC to provide dental examinations and dental cleanings

9    on separate visits. We can imagine, for example, that because FQHCs are often

10   remotely located it might be impossible to staff an FQHC for both services on the

11   same day, or that an FQHC may only wish to provide one or the other of the

12   services based on community needs, and so forth. The Medicaid Update provides

13   what we consider to be a costless solution to this conundrum, by allowing

14   FQHCs to annotate the justification for billing unbundled dental services. The

15   FQHCs provide no explanation as to why this is not a reasonable solution.

16   **III.  New York's Methodology with Respect to Making Supplemental**
17   **Payments to FQHCs Does Not Fully Satisfy the Requirements of Section**
18   **1396a(bb)(5)**

19         In addition to challenges to the PPS method for establishing each Health

20   Center's reimbursement rate pursuant to the general requirements of Section

1396a(bb)(1)--(2), the Health Centers also challenge New York's methodology for

making reimbursement payments to Health Centers that provide services

pursuant to a contract with an MCO. Section 1396a(bb)(5) contemplates such an

arrangement, requiring that in such a situation, "[i]n the case of services

furnished by a[n] [FQHC] . . . pursuant to a contract between the center . . . and a

managed care entity . . . the State plan shall provide for payment to the center or

clinic by the State of a supplemental payment equal to the amount (if any) by

which the amount determined under paragraph (2) [and] (3) . . . of this subsection

exceeds the amount of payments provided under the contract." Paragraphs (2)

and (3), as already described, first lay out the state's general PPS methodology for

per-visit payments, and also set out the rate by which these payments increase

going forward, to keep pace with inflation. 42 U.S.C. § 1396a(bb)(2)–(3). The

statute thus contemplates that there will be a difference in the amount that the

MCO contracts to pay the FQHC. In keeping with the general goal of Congress to

ensure that FQHC grants do not subsidize Medicaid generally, Congress has

provided that the FQHC grants should also not subsidize Medicaid managed

care. And it is also in keeping with the Congressional goal that FQHCs should

provide Medicaid services to MCO enrollees: prior to this statute, the

requirement was that MCOs would have to contract with FQHCs to pay the full

1    rate for services themselves. *See generally N.J. Primary Care Ass'n, Inc.*, 722 F.3d at

2    540–41. The deletion of this provision allows MCOs to negotiate their own rate

3    for FQHC care of MCO enrollees, incentivizing MCOs to contract with FQHCs.

4    The state's responsibility remains to avoid allowing Section 330 Medicare grants

5    to cross-subsidize Medicaid programs. *See Three Lower Cnties.*, 498 F.3d at 297.

6           CMS has never approved New York's methodology for providing payment

7    of the difference between an FQHC's PPS rate and the amount provided for

8    under the contract between the MCO and the FQHC. SPA 01-03 "at least

9    mentioned the supplemental payment methodology." *Cmty. Health Care Ass'n of*

10   *New York*, 921 F. Supp. 2d at 141. However, New York's methodology for

11   calculating this payment, as laid out in SPA 01-03, closely tracks the language of

12   42 U.S.C. § 1396a(bb)(5). Any supplemental payment methodology was not based

13   on the agency's expertise or consideration of the State's interpretation of the

14   supplemental payment methodology as consistent with the Medicaid

15   requirements." *Id.* at 141–42. As this presents a question of law, our review of

16   New York's methodology for calculating this supplemental payment to FQHCs is

17   de novo. *See Turner v. Perales*, 869 F.2d 140, 141 (2d Cir. 1989) ("[T]he question is

18   whether the state law and implementing regulations are consistent with federal

19   law. This is an issue of law, subject to *de novo* review in federal court . . . .").

1    The current[3] supplemental payment "is the average difference between

2    what [the] FQHC is paid by contracted MCOs and its specific blended Medicaid

3    rate for each year. The blended Medicaid rate is a weighted average of the

4    center's PPS rate, offsite service rate, and group counseling rate." *Cmty. Health*

5    *Care Ass'n of New York*, 921 F. Supp. 2d at 135 (internal quotation marks omitted).

6    The Health Centers raise a number of objections to this policy. We may

7    dismiss one immediately. Having resolved the Health Centers' challenge to the

8    use of a special rate for offsite and group services above, we find nothing

9    objectionable in their inclusion in New York's wraparound methodology. Next,

10   the Health Centers challenge New York's general policy of employing a

11   prospective methodology to establish an FQHC's wraparound rate. The Health

12   Centers contend that such a method conflicts with the substantive provisions of

13   Section 1396a(bb)(5), in particular its requirement that states reimburse FQHCs in

14   amounts that are "equal to" the difference between the Center's PPS rate and the

15   amount paid by the MCO. The district court rejected this challenge, as do we.

---

[3] Like the district court, we note that the rate described above differs in some respects from the prospective rate first introduced in 2007, in that it includes payments for offsite and group therapy services, but, because the Health Centers seek only prospective relief, it is unnecessary to determine with specificity when the state made this modification to its supplemental payment methodology. *Cmty. Health Care Ass'n of New York*, 921 F. Supp. 2d at 135 n.3.

46

1  **A.   Section 1396a(bb)(5) Permits a Prospective Methodology for**
2  **Calculating Wraparound Rates**

3   The Health Centers challenge, as a general matter, New York's decision to

4   employ a prospective method for calculating a given Health Center's

5   wraparound rate using data from the previous year's Medicaid eligible

6   encounters. Importantly, they do not challenge the use of any of the specific

7   inputs in this calculation, such as the Medicaid blended rate, outside of the

8   challenges to the PPS and other inputs in this calculation which we have already

9   found, above, to be compliant with the requirements of Section 1396a(bb). The

10  crux of the Health Centers' argument is that Section 1396a(bb)(5) requires that the

11  wraparound payment be "equal to" the difference between the rate paid to the

12  Centers as a result of the PPS rate, and the amount paid to the Centers by the

13  MCOs. Thus, the Health Centers conclude that Section 1396a(bb)(5) sets up a

14  "'simple equation' that results in a precise number."

15   We cannot endorse the Health Centers' unnecessarily restrictive reading of

16  Section 1396a(bb)(5). It is true that "[w]hen the statutory language is plain, the

17  sole function of the courts . . . is to enforce it according to its terms." *Arlington*

18  *Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (internal quotation

19  marks omitted). But there are no terms in this statute that establish the exact

1    mechanism by which states must calculate the difference between the PPS

2    payments and the MCO payments. Further, we think it unlikely that Congress

3    would provide a wide "measure of discretion . . . in choosing how to expend

4    Medicaid funds," *Wilson-Coker*, 311 F.3d at 134, as a general matter, only to

5    hamstring state reimbursement in a particular instance by prescribing, without

6    any CMS input, a single method for calculating the state's wraparound payment

7    obligation.

8          An examination of the structure and purpose of the statute supports New

9    York's decision to employ a prospective methodology to calculate the

10   wraparound payment rate to FQHCs. "Mere incantation of the plain meaning

11   rule, without placing the language to be construed in its proper framework,

12   cannot substitute for meaningful analysis. . . . The appropriate methodology . . . is

13   to look to the common sense of the statute . . . , to its purpose, to the practical

14   consequences of the suggested interpretations, and to the agency's own

15   interpretation for what light each inquiry might shed." *N.Y. State Comm'n on*

16   *Cable Television v. FCC*, 571 F.2d 95, 98 (2d Cir. 1978) (internal quotation marks

17   omitted). Here, it is clear that Congress exhibited a preference for states to

18   implement a prospective methodology to calculate reimbursement rates to

19   FQHCs. To adopt the reading urged by the Health Centers, forbidding

48

1    prospective calculation of the wraparound rate under Section 1396a(bb)(5),

2    would require us to read the statute at cross-purposes with itself. We will not

3    conclude that the general preference for prospective payment in Section

4    1396a(bb)(2) is undercut by the requirement of equal payments in Section

5    1396a(bb)(5).

6          Additionally, CMS guidance on the implementation of Section 1396a(bb)

7    supports the conclusion that the statute allows for prospective payment of the

8    wraparound rate. As the Third Circuit has explained, the need to make

9    wraparound payments first arose as a result of the passage of the BBA in 1997,

10   which "removed the responsibility of MCOs to reimburse FQHC[]s at their cost-

11   based rates . . . . Rather, MCOs could agree on a contractual reimbursement rate

12   as long as that rate was no less than the amount offered to a non-FQHC." *New*

13   *Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 540. The wraparound payment scheme

14   was implemented to ensure that even in managed-care states, FQHCs still

15   received the full reimbursement amount. *Id.* An interpretive letter to state

16   Medicaid Directors from CMS, which the Third Circuit found persuasive in

17   addressing a related challenge to New Jersey's payment methodology for

1     FQHCs,[4] specifically declared, "The State payment system for the supplemental

2     payments may utilize prospectively determined rates or may pay interim rates

3     subject to reconciliation." April 20, 1998, Health Care Financing Administration

4     State Medicaid Director Letter, *available at*

5     http://medicaid.gov/Federal-Policy-guidance/federal-policy-guidance.html.

6         The Health Centers urge that this letter refers only to the general

7     alternative payment methodologies provisions of Section 1396a(bb)(6), which

8     was enacted later, but this argument fails. As we have explained above, Section

9     1396a(bb)(6) is most naturally read, in the context of the statute, as providing

10     states and FQHCs an avenue to avoid the general provisions of Section 1396a(bb),

11     not specific aspects of the statute such as the PPS rate or, in this case, a

12     prospective methodology for calculating a wraparound rate. *See Pee Dee Health*

13     *Care, P.A.*, 509 F.3d at 207.

14         The Health Centers unsuccessfully attempt to rely on *Three Lower Counties*

15     and *N.J. Primary Care Association* for the proposition that the "equal to" language

16     in Section 1396a(bb)(5) is dispositive. True, in both those cases the Third and

17     Fourth Circuits stressed this language to emphasize the obligations of the state

---

[4] As the Third Circuit noted, and as we agree, the approach adopted in this letter is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *New Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 541 n.5.

1     with respect to FQHCs. But in those cases, the Courts of Appeals were

2     considering state repayment methodologies in cases where the state either

3     admitted that its methodology would lead the state to fail to make whole the

4     FQHCs, *N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 540 ("[T]he State concedes that

5     the methodology it has chosen . . . will result in failures to fully reimburse

6     FQHCs at the PPS rate for valid Medicaid claims."), or the evidence

7     overwhelmingly demonstrated that the state's methodology led to shortfalls for

8     FQHCs, *Three Lower Cnties.*, 498 F.3d at 300 (Maryland's method of providing

9     partial supplemental payment to one health center, then later reconciling the

10    difference, led to a shortfall of almost $2 million dollars for the center). This is not

11    the case here. At least as a general matter (that is, absent a consideration of the

12    "paid claims" policy, which we will soon turn to) the Health Centers have

13    presented no evidence that a prospective method of calculating the FQHCs'

14    wraparound payment has produced, or will produce, systematic shortfalls to the

15    FQHCs.

16         Finally, in interpreting this statute we must consider the "practical

17    consequences" of our reading. *N.Y. State Comm'n on Cable Television,* 571 F.2d at

18    98. The Health Centers argue that the prospective methodology was

19    implemented "for no fathomable reason."  But the Health Centers' own briefs

1    concede not only a fathomable, but entirely reasonable, justification for

2    introducing a prospective calculation of the wraparound payment. The Health

3    Centers acknowledge that under the previous, non-prospective system, between

4    2001 and 2007, it took on average three years for New York to appropriately

5    reimburse Health Centers the wraparound rate to which they are statutorily

6    entitled. Thus, New York was not in compliance with its obligation to make

7    wraparound payments within the four-month time period laid out in Section

8    1396a(bb)(5)(B). Our recognition of these practical consequences, moreover, in no

9    way invents a "burdensomeness defense," *Three Lower Cnties.*, 498 F.3d at 301, to

10   a state's obligation to make wraparound payments within the four month time

11   period laid out in Section 1396a(bb)(5)(B). This is because, as we have already

12   explained, there is no evidence that FQHCs are being shortchanged by the

13   existence of a prospective wraparound methodology as such.

14       In sum we, like the district court, reject the Health Centers argument that

15   there is a "simple mathematical equation for determining supplemental

16   payments," *Cmty. Health Care Ass'n of New York*, 821 F. Supp. 2d at 143, and

17   affirm the district court's conclusion that New York's decision, as a general

18   matter, to employ a prospective methodology to calculate a given FQHC's

19   wraparound rate is not contrary to Section 1396a(bb)(5).

1    **B.    Section 1396a(bb) Does Not Permit the Cost of MCO Non-Payment**
2    **to be Borne by FQHCs**

3    The Health Centers raise two challenges to New York's policies regarding

4    the risk that an MCO will not reimburse an FQHC for services it provides. Both

5    challenges raise the possibility that FQHCs will "be left holding the bag," *New*

6    *Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 541, a clearly impermissible result given

7    that "the FQHC is the clear beneficiary of the statute, and the State has a clear

8    responsibility to make a supplemental payment in the case of services furnished

9    by a[n] FQHC." *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 145

10   (internal quotation marks omitted). Further, because the risk of non-payment by

11   an MCO now has no remedy in New York's prospective calculation of an

12   FQHC's wraparound payment, aspects of New York's prospective wraparound

13   payment methodology must also be enjoined.

14   **1.    FQHCs Cannot Be Required to Bear the Cost of Non-**
15   **Payment by an MCO for Services to an MCO Enrollee**

16   While the use of a prospective payment system for calculating the

17   wraparound rate that a state must pay to an FQHC is permissible under Section

18   1396a(bb)(5)(A), the particular manner in which New York has determined that it

19   will determine its wraparound obligation creates the impermissible risk that

20

1    FQHCs will bear the cost of non-payment by MCOs for Medicaid services that

2    they provide.

3           The entirety of New York's supplemental payment system is set out in a

4    document called the Supplemental Payment Program. The Supplemental

5    Payment Program, which was not issued pursuant to any official state regulatory

6    procedure, but rather emailed and posted to the FQHCs, and is not available on

7    DOH's website, consistently gives the impression that FQHCs are only entitled to

8    report, and thus claim a wraparound reimbursement for, Medicaid encounters

9    for which an MCO has paid an FQHC. Thus, the Supplemental Payment Program

10   reads as follows; "Each qualifying FQHC's 'supplemental payment' is the

11   average difference between what that FQHC *is paid* by contracted MCOs and its

12   specific blended Medicaid rate;" "FQHCs must list . . . the number of visits [for

13   which] each [MCO] *paid* the FQHC;" "The information . . . submitted . . . may be

14   validated by the [DOH] using . . . : Medicaid *paid supplemental claims* billed by

15   FQHCs for the period, MCO encounter data showing *paid* FQHC visits, MCO . . .

16   Reports . . . which list contracted FQHCs and *paid* visits;" "Supplemental claims

17   cannot be billed for visits for which the MCO denies *payment*." App'x at 629--30,

18   632--33 (emphasis added). Additionally, the MCVR Report in which FQHCs must

19   report the number of MCO visits for which they have been paid in order to

1    generate their supplemental payment for the coming year includes a column

2    which only references the "Number of Visits Paid by [MCO]." App'x at 627.

3    Notwithstanding the emphasis on paid visits in the Supplemental Payment

4    Program, the Commissioner's contends, based on evidence consisting of

5    deposition testimony and affidavits from DOH officials, that the FQHCs may

6    claim reimbursement for services they provided pursuant to an MCO contract for

7    which they have not been paid for the purposes of receiving a wraparound

8    payment.

9    In addition, the Commissioner also contends that, in the event that an

10   MCO determines that it does not have an obligation to pay an FQHC, and New

11   York has made a supplemental payment to the FQHC, the FQHC is under an

12   obligation to return the payment. If the FQHC believes that the MCO is in the

13   wrong, then the Commissioner takes the position that the FQHC must

14   "vigorously pursue its complaint, both with the [MCO] in question and DOH's

15   Bureau of Managed Care Certification and Surveillance ('BMCCS')." App'x at

16   421.

17   The district court concluded that there was one primary method available

18   to FQHCs to contest MCO non-payment, which is codified in the New York

19   regulations.  10 N.Y.C.R.R. § 98-2.1. This complaint mechanism, however, is only

1    available where the MCO denied payment"on the grounds that the health care

2    service is not medically necessary or is experimental or investigational." *Id.*

3        On appeal, the Commissioner argues that this was incorrect, as the BMCCS

4    has its own internal complaint mechanism. The entirety of the evidence of this

5    alternative complaint mechanism, which also is not codified anywhere in New

6    York regulations, consists of a document called the "Policies and Procedures for

7    Managed Care Organization Complaints" ("Complaints Policy"). The

8    Complaints Policy defines a "complaint" as a "written or verbal contact to the

9    Department." It appears that the BMCCS itself has no authority to compel action

10   by either a different branch of the DOH, nor MCOs themselves, but rather, only

11   to inform other branches of DOH, or MCOs, of the validity of complaints which it

12   processes. And the areas which BMCCS may investigate with respect to

13   reimbursement procedures are extremely circumscribed: "Generally, there is no

14   authority for [DOH] to intercede in payment disputes between providers and

15   their managed care plans as reimbursement is governed by the terms of the

16   contract." App'x at 440. Finally, the Complaints Policy indicates that "The New

17   York State Insurance Department reviews 'prompt pay' complaints." *Id.*

18       The fundamental shortcoming with the Supplemental Payment Program

19   and the Complaints Policy is that together these policies make the MCO the

1    ultimate arbiter of the reimbursability of services that an FQHC provides

2    "pursuant to a contract" with an MCO. 42 U.S.C. § 1396a(bb)(5)(A). This cannot

3    be squared with the text of Section 1396a(bb)(2), which imposes an absolute

4    burden on the state to reimburse FQHCs for the entirety of their reasonable costs.

5    Nor can it be squared with the clear intent of Congress to ensure that Section 330

6    centers do not end up subsidizing state Medicaid programs. The Commissioner

7    does not dispute "that MCOs often deny payments for reasons unrelated to

8    Medicaid . . . e.g., MCO delays, multiple visits in different locations in the same

9    day, and visits with non-primary care physicians." *New Jersey Primary Care Ass'n,*

10   *Inc.*, 722 F.3d at 542. The result is the potential for FQHCs to be reimbursed

11   neither by MCOs, nor New York for services they provide.

12         Our conclusion is consistent with the holdings of the two other Circuits to

13   consider this issue. In *Three Lower Counties*, the plaintiff health center challenged

14   "Maryland's requirement that FQHCs submit claims to a Medicaid enrollee's

15   managed care organization, rather than to the [DOH] . . . . Because [MCOs]

16   process the claim initially and the State relies on this information, [plaintiff]

17   believes that Maryland has improperly delegated to the [MCO] the determination

18   of whether a supplemental payment is necessary." *Three Lower Cnties.*, 498 F.3d at

19   305. The Fourth Circuit rejected this challenge, finding that there was nothing in

57

1    the Medicaid Statute that prohibited such delegation. The decision thus turned

2    on the question of whether a state institution, as opposed to a private institution,

3    might have the initial authority to make a determination as to whether a

4    supplemental payment was required. The outcome did not turn on the

5    sufficiency of procedures by which an FQHC could challenge an MCO's decision

6    with respect to payment—indeed, it does not appear as though such an argument

7    formed part of the basis for the plaintiff's challenge in that case. It was not

8    disputed that ultimately, "[t]he Department of Health itself . . . makes the

9    determination whether a supplemental payment . . . is necessary." *Id.* at 305. The

10    situation is precisely the opposite here. In light of the absence of any meaningful

11    appeal process, the MCO's judgment is de facto final.

12    *New Jersey Primary Care Association* is similarly illuminating. New Jersey

13    implemented a policy, on short notice, which changed the method for calculating

14    wraparound repayments to FQHCs from one in which FQHCs were responsible

15    for reporting data to the state to one in which the state calculated the

16    wraparound payment using "FQHC claim data from MCOs." *New Jersey Primary*

17    *Care Ass'n, Inc.*, 722 F.3d at 532-33. The Third Circuit rejected this approach to

18    calculating the wraparound. Recognizing that "states may rely on MCOs to

19    determine whether a claim is Medicaid eligible," the Court nevertheless went on

1    to rule that "[i]n the absence of any process by which an FQHC may promptly

2    and effectively challenge an adverse MCO determination within the statutorily

3    mandated time period," New Jersey's collection of wraparound data must be

4    enjoined. *Id.* at 542-43. We find *New Jersey Primary Care Association* and *Three*

5    *Lower Counties* persuasive. A state may take the MCO claim verification process

6    into account in calculating its wraparound obligation, both prospectively and for

7    a particular Medicaid encounter, but the MCO cannot be the final arbiter of

8    whether a claim is Medicaid eligible.

9         On appeal the Commissioner argues that the district court "misunderstood

10   the administrative review mechanisms that are available in New York." It

11   attempts to buttress this point by arguing that "[t]he remedial plan approved by

12   the district court did not create new administrative procedures or expand the

13   grounds for relief under existing procedures, but rather, clarified the scope of

14   those procedures—including by reminding FQHCs of their right to challenge

15   action by MCOs contrary to Medicaid statutes and regulations."

16        The argument is entirely untenable. The basic premise is that neither

17   FQHCs (the beneficiaries of the Complaints Policy) nor the district court (the first

18   evaluator of the Complaints Policy) could appreciate all of the remedial options

19   that New York made available to health service providers contracting with

Case 13-171   Document 159   Page 60   10/17/2014   1356767 of 71

1    MCOs. But if this is true, then that shortcoming must be borne by New York.

2    First, while we are not evaluating any claim that New York failed to follow its

3    own administrative procedures in promulgating the Complaints Policy, we think

4    it probative that the Complaints Policy that we are evaluating is, in essence, not a

5    regulation or rule. Rather, it seems to be a working document prepared by the

6    BMCCS, subject to change. While it sets out goals for the timely processing of

7    complaints, it does not in any sense contain language that would bind BMCCS to

8    its procedures.

9         Second, the terms of the document itself disclaim a general "authority for

10   [DOH] to intercede in payment disputes between providers and their managed

11   care plans as reimbursement is governed by the terms of the contract." App'x at

12   440. We think a plain reading of this document would give notice that the

13   Complaints Policy does not provide a mechanism for Health Centers to take their

14   grievances against an MCO to DOH.

15        Third, we do not understand the basis on which the Commissioner is

16   asserting that the proposed injunctive relief "did not create new administrative

17   procedures." The district court order entering this relief notes that the injunction,

18   among other things, provides for "[s]pecial rate codes that permit plaintiff

19   FQHCs to directly bill DOH payment for the full PPS rate for services [where

60

1    payment] was improperly denied." Special App'x at 33. It also standardizes the

2    sequencing by which an FQHC may submit claims for payment and complaints,

3    again using a special rate code. Special App'x at 34. Finally, it distinguishes

4    between the contract remedies that FQHCs should use in pursuing their

5    grievances against MCOs and grievances that should be brought before BMCCS

6    in a way that, by clarifying BMCCS jurisdiction, cements the right of FQHCs to

7    use these procedures. Special App'x at 34.

8          By failing to make available a meaningful mechanism, New York has not

9    satisfied the obligations imposed on it by Section 1396a(bb)(5)(A).  The district

10   court's grant of summary judgment to the Health Centers on this issue is

11   affirmed.

12          **2.     FQHCs Cannot be Required to Bear the Cost of Non-**
13                  **Payment by an MCO for Services Provided to an Out-of-**
14                  **Network MCO Enrollee**

15         The Health Centers also challenge New York's policy of not reimbursing

16   FQHCs when they provide services to an MCO enrollee if that enrollee receives

17   services from an FQHC with which the MCO does not have a contract. The

18   Commissioner relies on 42 U.S.C. § 1396b(m)(vii), which permits states using

19   MCOs to implement their Medicaid programs to provide, in their contracts with

20   MCOs, that either the MCO or the state provide reimbursement for "medically

1    necessary services" if "the services were immediately required due to an

2    unforeseen illness, injury, or condition." New York opted to place this burden on

3    MCOs in its standard MCO contracts. The Commissioner further argues that the

4    plain text of Section 1396a(bb)(5)(A), which provides for supplemental payments

5    only "pursuant to a contract," precludes the necessity of providing for a

6    wraparound payment for out-of-network care, given that such services by

7    definition would not be provided "pursuant to a contract." The thrust of the

8    Commissioner's argument is that, for these services, the Health Centers simply

9    "must absorb these costs." *Three Lower Cnties.*, 498 F.3d at 304. The Commissioner

10   contends that this is a necessity in a managed care system, because MCOs are

11   able to achieve efficiency only if they are able to "direct patients to certain

12   providers." Further, they contend that because FQHCs generally lack emergency

13   rooms, the situations in which an MCO would be called on to reimburse an

14   FQHC pursuant to the model state-MCO contract will be rare.

15           We reject the Commissioner's contentions. While the Commissioner's

16   argument that the use of FCHCs for emergency medically necessary services may

17   be rare has force, it in no way answers the objection to the Commissioner's

18   general position—requiring Health Centers simply to "absorb the costs"—that

19   the statute requires that FQHCs be made whole.  It certainly falls short of

1    resolving the question of how FQHCs are to be reimbursed for such encounters.

2    The Commissioner's response only minimizes the problem—it does not resolve

3    it. Further, the Commissioner's reliance on New York's standard MCO contract

4    under Section 1396b(m)(vii) is not persuasive. "It is a basic principle of statutory

5    construction that a specific statute . . . controls over a general provision." *In re*

6    *Stoltz*, 315 F.3d 80, 93 (2d Cir. 2002) (alteration in original) (internal quotation

7    marks omitted). Here, the Commissioner is invoking the general provisions of

8    Section 1396b(m), which deal with contractual arrangements between states and

9    MCOs on the whole. But for reasons that we have explained above, FQHCs

10   occupy a unique place in the health services ecology. The fact that MCOs are the

11   primary avenue for payment for out-of-network emergency care under New

12   York's standard contractual arrangements cannot relieve the state of its specific

13   burden to ensure payment to FQHCs under Section 1396a(bb)(2).

14       Moreover, while the Commissioner is correct that Section 1396a(bb)(5) only

15   includes language that requires a state to make a supplemental payment for a

16   service provided "pursuant to" a contract, that obligation cannot be read in

17   isolation from the general obligation that FQHCs receive "100 percent . . . of the

18   costs . . . which are reasonable and related to the cost of furnishing services." 42

19   U.S.C. § 1396a(bb)(2). To the extent that out-of-network services constitute a part

63

1    of the services provided by FQHCs, there must be some arrangement by which

2    FQHCs may be reimbursed for them. If that contractual arrangement is between

3    the state and the MCO in the first instance, under Section 1396b(m)(vii), that is

4    permissible. But if this arrangement stops short of ensuring full repayment for

5    these services because there is no method for appealing an MCO's refusal to pay,

6    then it does not comport with the statute. We agree with the Third Circuit that

7    the fairest reading of the statute is to require MCO payment for services under

8    Section 1396a(bb)(5) "[i]n light of . . . unmistakably clear statutory requirements."

9    *Three Lower Cnties.*, 498 F.3d at 304. The proposed injunctive relief which the

10   district court approved included the necessary procedural mechanism to ensure

11   that FQHCs would have the opportunity to seek redress in the event of non-

12   payment.

13            This reading appropriately balances the various Congressional incentives

14   for providing services under Medicaid. Ultimately the state, holding the

15   Medicaid purse strings, is in the best position to evaluate the failure, or success,

16   of ensuring in-network care by MCOs in their dealings with FQHCs. If there is a

17   problem in ensuring that this type of access is respected, then it falls to the state,

18   in its wide "measure of discretion," *Wilson-Coker*, 311 F.3d at 134, to evaluate the

19   reasons for this failure and to take the necessary steps to remedy this problem.

1

**C.      Because There Are Disputed Issues of Material Fact as to How FQHCs May Claim Reimbursement for Unpaid MCO Claims for the Purpose of Calculating an FQHC's Prospective Wraparound Rate, the Decision of the District Court Must Be Vacated in Part**

6          The district court determined that "[an] FQHC may submit claims to MCO

7    and DOH at the same time and receive the supplemental payment." *Cmty.*

8    *Healthcare Ass'n of New York*, 921 F. Supp. 2d at 135. That determination resolved

9    the Supplemental Payment Program's procedures for FQHCs to claim

10   reimbursement for an MCO-covered encounter. However, it did not resolve the

11   related issue of what data the FQHC may submit to New York in its MCVR

12   Report for purposes of establishing its prospective wraparound payment rate.

13   The FQHCs point out on appeal a disjunction between two components of the

14   district court's decision. They note that while "[t]he district court correctly held

15   that the [s]tate's paid claim policy is unlawful, . . . [it] did not address the fact the

16   state's method of calculating each center's estimated wraparound 'rate'

17   incorporates the very 'paid claim' policy the court declared unlawful." We agree

18   with the FQHCs that the district court's decision seems internally inconsistent in

19   this respect. While it may be undisputed that at the "retail" level the FQHC may

20   put in a claim for a wraparound payment with New York at the same time that it

65

1    puts in a claim for payment pursuant to a contract with an MCO, this requested

2    wraparound payment would be based on the wraparound rate set by the

3    Commissioner based on data on revenue and visits from the previous year. This

4    does not, however, answer the question of whether, at the "wholesale" level, in

5    filling out the MCVR Report, the FQHC may report—and the Commissioner

6    would include in his calculus— (a) the total number of visits for which an FQHC

7    has been paid by the MCO, or (b) the total number of visits for which the FQHC

8    provided services pursuant to a contract with an MCO, and for which it expects

9    to be paid.

10         The distinction in the data reported by the FQHCs and relied upon by the

11   Commissioner, in turn, may have a profound impact on New York's calculation

12   of the FQHC's prospective wraparound rate. As the Health Centers explain, the

13   prospective wraparound payment is calculated by dividing the FQHC's revenue

14   from an MCO by the number of visits by MCO enrollees. Therefore, if the MCVR

15   Report holds revenue constant, but "exclud[es] unpaid visits in the calculation of

16   the average per visit . . . MCO payment[], the average MCO payment goes up as a

17   matter of simple arithmetic." The FQHCs therefore conclude that "[b]ecause an

18   FQHC's . . . per visit wraparound payment is computed by deducting the visit

19

1    average from the center's per visit rate, the higher the average of the prior year's

2    average payment, the lower the current year's 'wraparound rate.'"

3        The evidence in the record suggests that the FQHCs correctly assert that,

4    while they may simultaneously submit a claim to both New York and the MCO

5    for reimbursement, they may not include visits in its MCVR Report for which the

6    MCO has not paid. New York's deposition witness on the subject, Nicholas

7    Cioffi, testified that, contrary to the most natural reading of the Supplemental

8    Payment Program, the FQHC may submit a claim for reimbursement to both

9    New York and the MCO simultaneously. When discussing the MCVR, however,

10   he stated that "[a]ny visits that are not paid by the MCO should be excluded from

11   the report." App'x at 608. This is in keeping with the language of the MCVR,

12   which includes a section for the FQHCs to report the "Number of Visits Paid by

13   MCO[]." App'x at 627.

14       There is insufficient record evidence to definitively determine whether the

15   Supplemental Payment Program comports with Section 1396a(bb)(5)'s

16   requirement regarding the level of reimbursement due an FQHC, *see* discussion

17   at 21-23, *supra*.  While we recognize the strength of the FQHCs' argument, we

18   cannot assess the accuracy of their assertion that the inability to report in the

19   MCVR MCO visits for which the FQHC has not been paid has resulted in New

67

1    York, either sporadically or systematically, paying the FQHC anything less than a

2    wraparound rate to which it is statutorily entitled. In particular, we cannot find

3    evidence to support the FQHCs' assertion that revenue remains constant in the

4    MCVR, such that the MCVR, by excluding unpaid visits, artificially inflates the

5    average MCO payment-per-visit. Indeed, the MCVR requests information on

6    "MCO[] Payments to FQHC." App'x at 627. Without more, we cannot conclude

7    that the revenue that the FQHC reports is not also on a per visit basis, which

8    means that the information requested for the MCVR would produce an accurate

9    MCO payment-per-visit, and, a fortiori, an accurate calculation of the

10   wraparound payment.

11          Summary judgment is only appropriate where "there is no genuine dispute

12   as to any material fact and the movant is entitled to judgment as a matter of law."

13   Fed. R. Civ. P. 56(a). In this case, the parties have cross-moved for summary

14   judgment on the issue of whether the prospective calculation of the wraparound

15   payment comports with the requirements of Section 1396a(bb)(5), and we have

16   found, as a general matter, that it does. These motions, however, also require us

17   to consider the subsidiary issue of whether the particular methodology for

18   calculating the prospective wraparound payment also satisfies New York's

19   obligations under Section 1396a(bb)(5). Construing the evidence in the light most

1    favorable to the FQHCs, *Anderson,* 477 U.S. at 255, we cannot conclude, on the

2    basis of the scant guidance for completing the MCVR contained in the

3    Supplemental Payment Program, the text of the MCVR itself, and the deposition

4    of Cioffi, that New York's supplemental payment methodology gives an accurate

5    average estimate of New York's supplemental payment obligation. However, we

6    also cannot conclude that New York's supplemental payment methodology leads

7    New York to systematically underestimate its supplemental wraparound

8    obligation.

9         To the extent that the district court did not recognize that the clash over

10   this component of New York's supplemental payment methodology was one that

11   turned on a disputed issue of material fact, it committed error. That portion of the

12   order of the district court granting summary judgment to the Commissioner on

13   the question of the compatibility of New York's supplemental payment

14   methodology with the requirements of Section 1396a(bb)(5) must be vacated, and

15   remanded for the limited purpose of resolving, inter alia, what an FQHC must

16   submit in its MCVR Report in order to establish the forthcoming year's

17   supplemental payment rate.

18        We leave to the district court's sound discretion the procedure that it may

19   wish to employ in order to resolve this dispute. The district court may conclude,

1     for example, that interests of efficiency and judicial economy are best served by

2     reopening the record for the limited purpose of taking evidence on the revenue

3     and visit data that FQHCs must supply in the MCVR Report.

4            The district court is uniquely positioned to evaluate any submissions on

5     this issue in the first instance for two reasons. First, as with an FQHC's ability to

6     seek a supplemental payment for an MCO encounter even if it has not received

7     payment from an MCO, New York may take the position that the FQHC can

8     report a visit for which it expects, but has not yet received, payment, thus

9     clarifying the language of the Supplemental Payment Program in litigation and

10    effectively mooting the issue, while guaranteeing its payment methodology

11    ensures FQHCs will prospectively receive full supplemental payment. Second, it

12    may be that the scope of the injunctive relief ordered by the district court, which

13    currently provides avenues for FQHC complaints and special rate codes for

14    reimbursement for challenged visits, will have repercussions on the content of

15    the MCVR Report going forward. This may be the case, for example, if such

16    complaints form the basis of "other data sources available to the department" in

17    its validation of an FQHC's MCVR Report. App'x at 620. The relief ordered to

18    remedy New York's paid claim policy will, we expect, need to be harmonized

19    with any relief that the district court might deem necessary to remedy the

1    potential defect in New York's prospective wraparound methodology that we

2    have identified. Any appeal from the district court's decision on remand must

3    proceed on a separate notice of appeal and will be heard by a panel of this Court

4    in the ordinary course.

5                                   **CONCLUSION**

6              The decision of the district court is affirmed in part, and vacated and

7    remanded in part.

8

9

10

11

12

13

14

15

16

17

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit